ANNA BELLE MELDRUM, RESPONDENT, v. SOUTHARD FEED & MILL CO., EMPLOYER, AETNA LIFE INSURANCE CO., APPELLANT.—74 S. W. (2d) 75.

Kansas City Court of Appeals. June 11, 1934.

*Julius C. Shapiro* and *William Goodman* for respondent.

*Madden, Freeman & Madden* for appellant.

BLAND, J.—This is an appeal from the judgment of the circuit court affirming an award of the Workmen's Compensation Commission in favor of the widow of one Charles B. Meldrum, who, it is claimed, died of an accidental injury received by him in the course of his employment with the defendant, Southard Feed & Mill Company.

It is insisted by the appellants that there is not sufficient competent evidence in the record to sustain the finding of the commission that the deceased·suffered personal injury or death by accident within the meaning of the Compensation Act.

The claim filed before the commission alleges that the death of deceased was caused by his ''being unusually and unduly exposed to extreme cold weather, and/or by induced overexertion in loading and carrying heavy sacks of feed from warehouse chute to freight

car, causing his sudden and unexpected collapse, and injuries to the physical and internal structure of his body, and resulting in pneumonia and other complications, and death." The commission found that "employee received an accident while transferring these sacks from the chute to place them in the freight car, and . . . the accident arose out of and in the course of his employment" and that the accident was the cause of his death.

The facts show that deceased was employed by the Southard Feed & Mill Company for approximately five years. For the last two years of his employment his work consisted mainly of that of a molasses mixer, and his duties were discharged on the second floor of the mill located in Kansas City. It was also a part of his regular duties to assist one Slusser in loading freight cars at the mill dock on the outside of the building when Slusser needed help. Deceased was called on to assist Slusser two or three times a week.

During the forenoon of February 9, 1933, deceased was directed to paper a forty-foot box car stationed at the dock preparatory to its loading, which he did. In the afternoon Slusser started to load the car with meal sacks weighing about 100 pounds each. He had finished one tier of forty sacks stacked across the north end of the car and was starting on the second tier when the foreman directed deceased to assist Slusser. The sacks were conveyed into the car from the packing floor above by means of an endless conveyor belt which delivered the sacks into a chute leading into the car. From the chute they were carried by the men and stacked in tiers within the car. The sacks came into the car at the rate of ten or twelve per minute, requiring each employee to handle five or six per minute. It was about sixteen feet from the chute to the place where the sacks were deposited. Slusser and deceased were the only persons present. They had been loading sacks for not exceeding twenty to thirty minutes and deceased had stacked twelve or fifteen sacks, when the latter, after depositing a sack in the car, started back to the chute apparently to obtain another sack. He took about two steps when he grabbed his chest with his hands and exclaimed, "Oh, My God," and was gasping for breath. Prior to his having this "spell" he had not said "a word" to Slusser. Deceased staggered around the car, "kept going down there," and finally Slusser said to him, "Charlie, get out in the air." Deceased then staggered out to the dock, without assistance, Slusser being busy with keeping the sacks from falling from the chute on to the floor and breaking. Deceased was shortly afterwards found on the dock by his foreman in a "hunkered down" position holding his chest and breathing hard. The foreman then assisted him into the building where he stayed a short time. He was then taken home where he died two days later.

The freight car in question stood upon a north and south track adjoining the dock with the west door of the car closed and the

east door, or the one next to the mill, open. The sacks came into the car through the east door. The car was unprotected from the elements, being situated on open ground on all sides and the temperature was below zero. It was "awfully cold" and "some of it (the wind) came in."

Slusser was six feet two inches in height and weighed 215 pounds. The sacks coming from the chute "slid right down" on Slusser's shoulder. Deceased was five feet seven inches tall and weighed 142 pounds. While the loading of this car was not a "hurry-up job" it was necessary for the workmen to walk "awfully fast" in doing the work.

Prior to the day deceased collapsed he appeared in good health and performed his work in a satisfactory manner. He was apparently a normal individual "enjoying life." He never had any ailment or sickness except a cold or influenza several years before. On his way home deceased complained of pains in his chest and numbness in his legs. Claimant testified that in the afternoon when she returned home she found deceased sitting in a chair by the stove; that he was pale, complained of pains in the upper part and center of his chest and in his lungs and was having difficulty in breathing; that this continued until he died; that when he left for his work on the morning of February 9th, he was apparently in good health; that she called Dr. Callaghan, the family physician, the evening of that day.

The facts further show that Dr. Callaghan signed the death certificate, in which he gave as the principal cause of death "Mitral Insufficiency" dating from 1932, with acute endocarditis and pleurisy, as contributing causes. The certificate specified "exposure" as the only connection between the death of the deceased and the employment. There was no post-mortem.

Dr. Callaghan testified before the commission that deceased had suffered from mitral insufficiency (a disease of the mitral valve of the heart) from the year preceding his death; that "the heart was enlarged or thickened;" that he examined deceased the day the latter was brought home from his work and found him suffering from pleurisy, pericarditis and endocarditis; that he examined his heart and lungs with a stethoscope and found friction rales or rubbing sounds in both; that these rales indicated inflammation of the serous membrane covering the heart and lungs; that the heart was very labored and there was a slight murmur detectable; that pericarditis is an inflammation of the covering of the heart and pleurisy an inflammation of the covering of the lungs; that the inflammation extended into the heart producing endocarditis; that deceased's condition was due to overexertion and exposure to the elements—the weather; that when he examined deceased he found his complexion somewhat pallid; that his "breathing was more of a shallow breath-

ing, slightly accelerated . . . and . . . it was painful—frequent;" that when he examined deceased's chest he found no bruises; that pleurisy could be caused by a blow on the chest but he found no evidence of any such blow, that is bruises.

He further testified that mitral insufficiency generally means dilatation of the heart; that "I didn't say his heart was dilated;" that mitral insufficiency may also mean a breaking down of the resistance of the heart; that his opinion was that the death was caused by exhaustion or breaking down of the mitral resources; that the breaking down of the heart's resistance is not particularly a slow process; that the breaking down in this case was caused by pleurisy and pericarditis; that the heart was already weak from mitral insufficiency; that pericarditis is always accompanied by endocarditis and that endocarditis may be caused by inflammation of the lungs in the region of the heart; that pleurisy is sometimes very painful and comes on suddenly, the pain being very acute; that it effects the breathing but does not cause one to breath heavily and coarsely but "more short" or panting; that the patient does not gasp for breath; that it is what you might say a "sighing breathing" and increases; that inflammation of the heart causes pain; that mitral insufficiency is often caused by over exertion; that it is caused by unusual labor and exposure to the elements; that deceased's death was caused, "undoubtedly, from the exertion principally, and from the exposure, which brought on the pleurisy, and caused the breakdown of the heart. . . .

"The man was working very hard, undoubtedly. There is no other known cause for the heart being in that condition, except from overexertion,, which is the same as often spoken of, as the athlete's condition, as I said a moment ago. Hence, his extreme, you might say, labor, not only put the heart in the condition it was in—not that day, necessarily, but probably over several weeks' time—that put the heart in this so-called 'athletic condition,' that brought on the breakdown, when the pleurisy came, and the pericarditis.

"Q. That was due to the unusual exposure, at the time? A. And the unusual exertion." . . .

"You know, the heart was the heart of a man that had done a great deal of heavy, extremely heavy work. The—I might say that was a condition, and the pleurisy and pericarditis that set up, you might say, extended on in to the heart. It is like a match would set off a powderhouse, caused the explosion that brought about. The man would be living today, if it hadn't been for that day's work, no doubt."

Dr. Callaghan further testified that in his opinion deceased would not have contracted pleurisy if he had not been engaged in performing physical labor at the time of the exposure. "In the first place, this condition, I believe, was the result of that extreme labor, that the man had been performing, labor that probably should have been

divided up more, in the past;" that the pleurisy probably would not have terminated fatally if it had not been for the fact that deceased was performing labor at the time he contracted it; that sudden death does not often occur from mere pleurisy; that the witness did not claim to be an "entire" expert on the amount of labor a man can do, "but we know that certain constant, heavy, extreme exertion will gradually wear down the heart." "Q. Yes. And your opinion is that it probably came on during a matter of several weeks, or—A. (interrupting) That is, the original heart-trouble? Q. Yes. A. Yes;" that in his opinion the exciting or direct cause of the death was pleurisy; that the friction rales or rubbing follows inflammation and pericarditis is very painful; that the inflammation is sometimes very rapid and comes from over-exertion and exposure; that he would not say that the rubbing would come on in as little as five minutes after the overexertion or exposure in a normal heart but "a few hours later it could" before "five hours later;" that pleurisy sometimes comes on very rapidly; that the inflammation causing pleurisy is a slow process except when it comes on from a strain or blow; that when it comes on from exposure it is "slower than instantaneous;" that inflammation could come on within ten minutes under the kind of exposure that deceased was subjected to at the time of his collapse; that "if he was not working or exerting himself seriously he might get by . . . the exposure alone," that is, "It might not have terminated in this pleuritic condition and this serious membrane inflammation;" that the exposure would have been "more drawn out" without the exertion; that exertion does not bring on inflammation of the pleura; that this is brought about by exposure when it is not the result of a strain or blow; that the inflammation of the pleura in this case was in the region of the heart in or about the left side of the chest; that the mitral condition that broke down under the pleurisy was preceded by inflammation and was a result of that; that the mitral insufficiency from which deceased had suffered for a year before preceded the condition of the pleurisy, pericarditis and endocarditis, which he found deceased suffering from when he examined him on February 9, 1933; that "pleurisy in the early stages seldom causes death unless the attack extends to one of the vital organs, like the heart;" that the death in this instance was caused by the mitral resistance breaking down through the inflammation, which "was not at that time, I don't believe strong;" that deceased had pleurisy prior to the breaking down. "Q. You think, at the time he gasped for breath and grabbed the center of his chest, he didn't have any breaking down of the heart resistance? A. Possibly some. In fact, I believe he did;" that the witness had determined from his examination that the mitral insufficiency was due to unusual labor, primarily. "Q. Mitral insufficiency is sometimes found in collapse

due to athletic overexertion? A. Yes, and in men that work very hard. Q. Unusual strain? A. Unusual labor. Q. Now, Doctor, assuming—leaving out of consideration for the purpose of this question—assuming this man was not engaged in any unusual labor, would the exposure alone have caused the collapse? A. I don't think so.''

Under the provisions of the Workmen's Compensation Act (Section 3301) there can be no compensation unless the injury or death is caused ''by accident arising out of and in the course of his (employee's) employment.'' Contrary to some of the Workmen's Compensation Acts, our statute provides that there must be not only an injury but an accident to the employee. Under the provisions of Section 3304, the word ''accident'' is defined as ''an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury.'' The term ''injury'' is defined as ''only violence to the physical structure of the body and such disease or infection as naturally results therefrom. Said section further provides:

''The said terms shall in no case except as hereinafter provided be construed to include occupational disease in any form, nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment, nor shall they include death. due to natural causes occurring while the workman is at work.''

It is well settled that an ailment or disease brought on by the employment does not constitute an accident within the meaning of the act. [Hoag v. Laundry Co., 113 Kan. 513; Linnane v. Aetna Brew. Co., 91 Conn. 158.] If deceased died, solely, from the effects of exposure to the weather there can be no compensation in this case, for it is well settled that exposure to the elements does not constitute an accident unless the character of the employment intensifies and increases the exposure. If the employee, because of his duties, is not exposed to a special or peculiar danger from the elements—a danger that is no greater than that to which other persons in the community are subjected—and an unexpected injury is sustained by reason of the elements, the injury does not constitute an accident arising out of and in the course of his employment. [Morris v. Dexter Mfg. Co., 40 S. W. (2d) 750; Taylor v. City Ice & Fuel Co., 56 S. W. (2d) 812; Delille v. Holton-Seelye, 66 S. W. (2d) 834, 836; Kripplaben v. Greenspon's et al., 50 S. W. (2d) 752; Van Kirk v. Hume-Sinclair, etc., 49 S. W. (2d) 631; Wright v. Keith (Kan.), 15 Pac. (2d) 429.] In the work that deceased was doing at the time of his ''spell'' he was not exposed to the cold weather to any greater extent than others in the same locality, indeed, even if as much. The fact that he was engaged in indoor work most of the time and only part of the time outside in the cold weather does not make

the effects of the exposure any more of an accident, even though the work that he was doing made him more susceptible to pleurisy. [Blair v. Omaha Ice & Cold Storage Co., 165 S. W. 893, 895; Miller v. St. Jos. Trans. Co., 32 S. W. (2d) 449, 451.]

We have examined the cases cited by plaintiff and find that in those involving accidents due to heat or cold recovery was allowed because the injuries were due to conditions surrounding the work, such as to cause the employee to be subjected not to general but special conditions. Such cases are Schulz v. Gr. Atl. & Pac., 56 S. W. (2d) 126; Carr v. John W. Rowan Plast. Co., 55 S. W. (2d) 729.

The remaining question to be disposed of is whether deceased suffered an accident, within the meaning of the act, by reason of his alleged overexertion at the time of his collapse.

The facts show that when deceased collapsed he was discharging the duties of his regular employment in the usual and ordinary way. It is true that his main duties were that of a molasses mixer. (There is no evidence whether this work was arduous.) However, it was equally as much his regular duty to assist Slusser in the loading of the meal sacks into freight cars as it was to perform his duties as a molasses mixer. At the time of his collapse deceased had been engaged not to exceed twenty or thirty minutes at work loading the car. However, the entire work that he did in loading the car did not cover a space of time of more than two or three minutes. Whether the work was divided over the period of time that he was there or was done in the last two or three minutes, the evidence does not disclose. But however the work was done, nothing that happened there, of itself, unaided by medical testimony, in any manner tends to show that an accident, within the meaning of the act, occurred to deceased. It is true that something happened to bring on the "spell" and to cause him to grab his breast in the region of his heart and exclaim, "Oh, My God." That was undoubtedly an unusual occurrence but was an occurrence as consistent with a "spell" from natural causes as from an accident, and a decision one way or the other would rest on mere speculation. A defective heart caused by diseases, which results in death, always reaches a point when something happens to the patient causing him to realize his condition. The fact that deceased collapsed at his usual work, even though arduous, is not sufficient, within itself, to make out a case. [Delille v. Holton-Seelye, supra; So. Gas. Co. v. Flores (Tex.), 1 S. W. (2d) 260; Leske v. Lehigh Valley Coal Co., 270 Pa. St. 15; Collins v. Brooklyn Union Gas Co., 156 N. Y. Supp. 957; Jakub v. Industrial Comm., 288 Ill. 87, 90; Stombaugh v. Wire Fence Co., 198 Mich. 445; Eaton v. Proctor (N. H.), 159 Atl. 297.]

There was evidence in this case that deceased's condition was due to overwork. But heavy work, alone, causing exhaustion, a stroke or "spell" unaccompanied by any mishap, abnormal occurrence or

event, such as extra exertion, a strain or a blow, is not sufficient to constitute an accident within the meaning of the Workmen's Compensation Act. [Delille v. Holton-Seelye, supra; Crews v. Moseley Bros., 138 S. E. 494.]

"Impairment of physical condition accruing from constant and continued labor, no matter how heavy or arduous it may be, is not covered by the Workmen's Compensation Law. [Industrial Comm. of Ohio v. Franken, 185 N. E. 199, 200.]

"If there was no abnormal effort or strain by the deceased, but merely the natural exertion incident to discharging his usual duties as fire marshal, the collapse of a weakened heart was not compensable. [Foster v. Borough of State College (Century Indemnity Co., Intervener) (Pa.), 168 Atl. 693, 695.]

In order for plaintiff to recover she should have shown that "some mishap, some untoward and unexpected event occurred without design; that some accidental injury was suffered, traceable to a definite time, place and cause. Merely experiencing the first symptoms of a disease while working is not sufficient—the injury must occur because of the work. [Frank v. C., M. & St. Paul Ry. Co. (S. D.), 207 N. W. 89, 91.]

"While the sudden death of an employee while doing work which calls for no unusual physical strain raises no presumption of an accident, this rule has no application where the work causes a fatal strain to a vital organ. If the demise is brought about by an injury due to some mishap or accident happening during the course of the employment, the fact that deceased has a chronic ailment which rendered him more susceptible to such injury than an ordinary person would be, will not defeat the right to compensation." [Calderwood v. Consolidated Lbr. & Sup. Co., 91 Pa. Sup. Rep. 189, 194, 195; see, also, Harder v. Thrift Const. Co., 53 S. W. (2d) 34, 37.]

Dr. Callaghan was the only medical expert introduced by plaintiff. His testimony does not show that any accident happened to deceased, within the meaning of the act, at the time of his collapse. His testimony does not show that there was any violence to the physical structure of the body at that time. He did not testify as to finding that the heart had suffered any violence from overexertion at the time in question. There was no evidence of a blow to the heart, rupture, hemorrhage or dilation occurring at that time. Taking his testimony as a whole it appears that deceased had, over a period of time, acquired the disease known as mitral insufficiency by reason of an overtaxing of his heart by overwork which overwork apparently consisted of carrying heavy sacks of meal hurriedly in loading freight cars. This overtaxing of the heart had gradually weakened it to such an extent that on the day he collapsed it finally gave way by reason of exposure to the cold and the continued overwork. To use the doctor's own language, "It broke down," resulting in the pleurisy,

pericarditis and endocarditis, from which he died. In other words the death, so far as overexertion is concerned, was due to a disease or diseases brought about from the effects of accumulated strains and overwork covering a long period of time and the cause could not be traced to any definite time, place or cause. Under such circumstances, it cannot be said that the death was caused by other than the condition of work rather than by an accident, within the meaning of the act. The gradual wearing out of a heart from exertion, whether mild or strenuous, does not give rise to a compensable injury. [Burns' case (Mass.), 165 N. E. 670.]

Dr. Lee, who testified for the defendant, attributed deceased's death to coronary occlusion, or a blocking of one of the arteries that supplies the heart with blood. However, Dr. Lee testified that pleurisy can be caused by trauma and inflammation; that impact is a form of trauma; that the most trivial trumatic injury to the chest may set up an irritation, if enough to bruise the pleura; that if some of the one-hundred pound sacks had come in contact with deceased's chest it could have caused trauma, bruised the pleura and set up inflammation. However, there is no evidence of any surface bruise and the doctor testified that for a bruise to be sufficient to cause internal trauma it would have to be of such magnitude as to bruise the pleura through the ribs, the muscles and the chest; that no trivial injury would be sufficient to do this; that unless there were surface abrasions it would take a "terrific impact;" that there could be trauma without external evidence of injury, which could cause cardiac exhaustion and that work similar to that that deceased was doing, continued over a long period of time would be "unusual strain of labor." "Any person can have a cardiac exhaustion if subjected to muscular strain over a long enough period of time." From what we have said cardiac exhaustion due solely to conditions of continual overwork is not compensable under our compensation act.

There is no evidence that deceased received any blow to his chest sufficient to bring about the condition from which he died. To hold otherwise would be indulging in mere speculation. Dr. Callaghan testified that he found no bruises or marks on deceased's chest and there is no evidence that he received a "terrific impact" to his chest, such as Dr. Lee testified might bring about internal trauma. In addition to this, there is no evidence that he received an internal trauma. There was no post-mortem. Dr. Callaghan was the only physician who examined him and he found merely that deceased was suffering from pleurisy, pericarditis and endocarditis, caused by exposure and overwork. Dr. Callaghan did not advance a theory that deceased suffered bruises and injuries from an impact to any part of his body.

We are not unmindful of the fact that in passing upon a question of this kind, that all the testimony, together with every reasonable inference that may be drawn therefrom, must be taken in its most favorable light to claimant and, in view of this rule, we have given a great deal of time and thought in an effort to uphold the finding of the Workmen's Compensation Commission, but we have been unable to evolve any theory that would justify us in so doing. We are of the opinion that, in view of the testimony, this is not a compensable case and the judgment is, therefore, reversed. All concur.