Hazel Maupin, Respondent, v. American Cigar Co., Appellant.—
84 S. W. (2d) 218.

Kansas City Court of Appeals. June 3, 1935.

*Grover & Brown* for respondent.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, Winston H. Woodson* and *John N. Monteith* for appellant.

SHAIN, P. J.—The respondent herein, who was plaintiff below, brought this action for damages against the American Cigar Company, appellant herein but defendant below.

For uniformity, we hereinafter refer to the parties as plaintiff and defendant as they appeared in the trial in the circuit court.

The basis of the plaintiff's claim is that she contracted an occupational disease while in the employ of defendant and due to the negligence of defendant.

The occupational disease is alleged as tobacco poisoning, or tobacesis, resulting from breathing in and absorption of tobacco dust and tobacco fumes and the irritation and poisoning therefrom resulting in bronchiectasis, chronic bronchial irritation, nervousness, loss of weight, weakness and tuberculosis.

The allegations of plaintiff's petition presented numerous allegations of negligence. However, at the trial the plaintiff abandoned as to all other allegations than the following, to-wit: Failure to provide and maintain adequate devices for carrying off poisonous or in-

.jurious fumes and dusts; and sweeping during working hours without dampening the floors to prevent the raising of dust; and failure to provide an approved and effective respirator.

Trial was by jury resulting in a verdict for the plaintiff in the sum of $3,000. Judgment was entered in accordance with the verdict and the defendant duly appealed.

### STATEMENT OF FACTS.

In the consideration of a case on appeal, when dealing with controverted facts, the evidence most favorable to the plaintiff must, of course, be considered and accepted as true.

It is well here to summarize as to some facts that appear not to be controverted. It was shown by the evidence that the defendant's plant was a large four-story structure, on each of the second and third floors of which were installed 117 cigar making machines. These rooms were 250 by 90 feet with 12-foot ceilings. The first floor was used for the preparation of the tobacco, whence it was conveyed to the second and third floors for manufacture into cigars. On the fourth floor, the cigars were banded and prepared for shipment. At the time plaintiff first worked for defendant, the building was equipped with a spraying apparatus which sent a fine spray of moisture over the operators and into the air. When she returned, a modern air-conditioning system had been installed by means of which the air was drawn out of the room and returned every two and one-half to three minutes. Double windows were installed and kept closed; the humidity being kept at substantially seventy-two per cent and the temperature of the room at seventy-five degrees at all times when the plant was in operation. The freshly conditioned air was forced in through many air ducts and drawn out through a ten by six foot opening. There were also suction ducts at each of the 117 cigar machines.

Four girls were employed on each machine. The first was called the filler, who placed the filler tobacco in position to be molded into the shape of a cigar; the second girl placed a coarser tobacco in position to bind the filler when shaped; the third was the wrapper, who placed a half leaf of fine quality tobacco upon a die which cut the tobacco into strips ten or twelve inches long and two inches wide, this wrapper then going through the cigar machine and wrapping the filler; the fourth girl was the finisher, who, as her name implies, gave the cigar the finishing touches.

The State factory inspectors were placed upon the stand by the defendant. Due to their official position, we state the substance of their testimony. These inspectors, who made semi-annual inspections, testified in substance to the effect that they never inspected a factory in better shape or condition than that factory was; that they never

required respirators because they did not think they were necessary.

It appears from the evidence that the defendant began operation of its factory January 1, 1930, and continued to operate same for over three years. The plaintiff first went to work in the factory in May, 1930, and worked until August of that year. She returned for work in the factory in June, 1931, and worked until March, 1932, when she quit. From June, 1931, until March, 1932, plaintiff worked in the capacity of wrapper layer and her work was on the third floor. The plaintiff appears to have had a physical examination at the beginning of each period of her employment and was pronounced as in good health.

There is evidence in support of the fact that there was fine tobacco dust in the air of the room in which the plaintiff worked. The evidence is to the effect that no respirators were furnished or used.

The plaintiff, as a witness in her own behalf, testified in substance that in September, 1932, some five or six months after she quit work, she had an X-ray taken of her chest, and again in December, 1933; both by Dr. Donaldson, an X-ray specialist of Kansas City. She testified that in March, 1932, Dr. McHale took samples of her blood; also that Dr. Frazier took a sample of her blood in October, 1932. She said Dr. Frazier told her that her blood was poisoned by fumes of tobacco; that she had poisoned blood.

Dr. Frazier, testifying on behalf of plaintiff, refutes her above statement. The following questions and answers are shown:

"Q. Doctor, did you examine her blood? A. No, sir.

"Q. You did not examine her blood? A. No, sir, and I didn't do it for the reason that she was pregnant.

"Q. Didn't you examine her blood and tell her that her blood was poison? A. Well, I don't think so. I may have, but I doubt it. That was two years ago. Absolutely no. This girl was pregnant. That is one reason why these pictures, the first one at least, was not conclusive. A pregnant woman with tuberculosis is twice diseased."

Dr. Clyde Donaldson, an eminent X-ray specialist, was called by the plaintiff as a witness and, based upon X-ray pictures taken by him approximately six months after the plaintiff left employment with defendant, he testified on matters pertinent to the issues herein substantially as follows: That he took X-rays of plaintiff on September 13, 1932, and on January 20, 1933. Both were in evidence. The doctor testified that the first shows thickening of hilus or root of lung on both sides; also thickened bronchial tubes and thickened pleura, indicates bronchitis. There is some irritation at base of lungs, causing congestion of pleural lining. The second film, taken in 1933, shows further exaggeration of bronchial markings, especially in upper portion of right lung where there is early evidence of tuberculosis. The plaintiff is getting worse.

In answer to a hypothetical question containing the conditions under which plaintiff's evidence showed she worked, the doctor stated that the natural and necessary consequences incident to such employment is an irritation of the lungs and bronchial tubes, producing bronchitis, which is often the forerunner of tuberculosis. If the vitality is lowered the vitality of the lungs and bronchial tubes is lowered; we are all breathing the germs of tuberculosis all the time, but if we are in good health, it does not take hold of us. In his opinion, tuberculosis would be incident to any kind of employment. The irritation prepares the culture for the germ. A wet sponge filter would prevent such irritation.

The doctor further testified that tuberculosis may be incident to any dusty working place, as harrowing corn, a man working in a wheat bin, or on a threshing machine, or stacking straw, or even a pedestrian on the street on a windy day. He admitted that he had never been in a tobacco or cigar factory; had never made a study of the effects of tobacco dust on the lungs. He found no evidence of tuberculosis in the first X-ray film. The second, taken shortly before the trial, shows a fan-like arrangement, evidence of recently formed tuberculosis. There is no evidence of cavities which means a long standing condition. There is no such condition in the first X-ray. He testified he did not know when she got it or what caused such condition. She might have gotten it out in the street, or other places. The X-ray shows old scars of tuberculosis which existed in childhood.

"Q. So as to when she got that condition or what caused it, you don't know? A. I do not.

"Q. She left the employment of the cigar company in March of 1932, six months before you took the first picture, and didn't go back to work, hadn't gone back to work at the factory nor worked any place since, but has been around taking care of herself; she received her baby and took care of her baby. She might have gotten the dust or something which caused this early t. b. which you have seen in the second picture, out on the street, Doctor, one of the windy days, or lots of places, might she? A. Yes, sir. It is impossible for me to tell where."

The doctor further testified that the dangerous age for pregnant women to contract tuberculosis is under twenty-five years. To make a positive diagnosis for tuberculosis requires more than an X-ray, such as an examination of the sputum, blood, physical examination and other methods.

"Q. (The Court): There is no evidence of incipient tuberculosis in the first picture? A. No, sir.

"Q. And just beginning to develop in the second? A. Yes, sir."

The doctor stated that dust is organic and inorganic. Organic

dust originates in vegetable and animal matter; inorganic dust is metallic. The former is absorbed by the lungs; the latter is not.

Dr. C. E. Frazier, called as a witness for the plaintiff, testified in substance as follows: That he saw her first on September 9, 1932, and has examined her several times since. The first time he suspected pulmonary tuberculosis and sent her to Dr. Donaldson for an X-ray picture; that he is not an X-ray specialist, but can interpret them as well as any average doctor. He testified that the first X-ray taken by Dr. Donaldson is *suggestive* of tuberculosis. The condition appears aggravated in the second X-ray. Later examinations with the stethoscope revealed distance murmurs in the lungs, the earlier examination very suggestively. The later examinations indicated the beginning of the destruction of tissue. Spitting up blood is a corroborative symptom. She is getting worse as time goes on. Loss of weight indicates lowered vitality. Irritation or inflammation in bronchial tubes is a natural and necessary consequence of employment under conditions plaintiff claimed to have worked. Tuberculosis might or could have resulted from inflammation of bronchial tubes.

On cross-examination the doctor said he had never been in a cigar factory or worked around tobacco. Tuberculosis is a germ, which is present in all of us, but is inactive. It is only when resistance is lowered inflammation from some irritation begins, and the germs breed and multiply. All kinds of dust irritate the lungs. He had never made any study of the effects of tobacco dust on the lungs; does not specialize in tuberculosis, but does treat it. Many things cause rales; you get dry rales in bronchitis; moist rales in tuberculosis. He did not examine plaintiff's sputum. Did not examine her blood, because she was pregnant. He was very indefinite about the number of times he saw the plaintiff.

On re-direct examination, he testified that the dust of tobacco, breathed nine hours a day, six days a week, for ten months, would be poisonous. A wet sponge placed over the nostrils would help to keep out the dust. When the vitality is lowered by pregnancy, there is greater danger to a twenty-five-year old girl of contracting tuberculosis.

Dr. Thos. McHale called by the plaintiff testified in substance as follows: That he examined her in February or March, 1932. She complained of weakness incident to pains in her chest. He examined her with a fluoroscope and found evidence of tuberculosis. He sent her to the country. Saw her again in July, 1932, and again on the Saturday before the trial. In his opinion, nicotine in tobacco dust, breathed into the lungs, is a very toxic poison. The percent of nicotine in tobacco is two to seven per cent in ordinary Havana tobacco leaves, higher in cheaper grades. He said he did not know the natural and necessary result of breathing tobacco dust under the con-

·ditions testified to by the plaintiff. He never was in defendant's plant. This is his first case of irritation of the lungs from breathing in tobacco dust. In his opinion, the plaintiff has active, progressive tuberculosis. Beside the use of the fluoroscope, he made a physical examination. She had angularity of the shoulder, muscles tensed, diminished movement of the diaphragm on right side, very free perspiration, told him she sometimes spit up blood; had poor appetite, nervous, felt weak and exhausted on ordinary exertion, all symptoms of tuberculosis. Irritants in lungs make them susceptible to tuberculosis by lowering resistance.

On cross-examination: Looking through fluoroscope, saw clouding of the chest; enlargement of lymph glands of front bronchial tree, upper part of lungs; saw diminished excursion of diaphragm. Pointed out enlarged bronchial tubes on Dr. Donaldson's first X-ray, which shows base of the lung has tuberculosis, in his judgment. Up to twenty-five years of age, more danger of a young women contracting tuberculosis; if also pregnant, danger is great. Did not examine her blood. Did not tell her that her blood was poison.

After Dr. McHale had testified, the plaintiff was recalled and contradicted the doctor by testifying that Dr. McHale told her as follows: "Tobacco fumes had gone in my pores and was in my blood and it had affected my lungs. He told me that I was poisoned by the tobacco."

Doctors and experts were called and testified in the defendant's behalf. We find nothing in the testimony of these witnesses that helps planitiff's case and therefore do not embrace their testimony in this opinion.

### Opinion.

Under head of points and authorities, the defendant makes seven specific claims of error. However, when these claims of error are considered they, with few exceptions, center on the outstanding claim that there was not a case made for the jury and that a directed verdict should have been given in favor of the defendant.

In this contention, we concludes that the defendant is right for reasons hereinafter set forth.

In the first place, the plaintiff did not produce any substantial evidence from which it can be concluded that the alleged occupational disease was peculiar or incident to the work or process carried on by the plaintiff.

In an opinion in a case before the Supreme Court, September term, 1934, Wolf v. Mallinckrodt Chem. Work, No. 30368, the court quotes with approval from an opinion by the Connecticut Supreme Court as follows:

"To come within the definition, an occupational disease must be a disease which is a *natural incident* of a particular occcupation and

must attach to that occupation a hazard which distinguished it from the usual run on occupations and is in excess of that attending employment in general.''

The evidence on the part of plaintiff discloses that she had old scars of tuberculosis, which existed in childhood, but that the X-ray taken approximately six months after she left defendant's employment did not show an active tuberculosis condition.

It is evident from the evidence that the plaintiff, during the time when employed, had latent germs of tuberculosis and that she was subject to bronchial irritation.

The evidence of plaintiff's own witnesses is conclusive to the effect that many causes were conducive to bronchial irritation and many causes conducive to development of latent germs of tuberculosis and the evidence is conclusive that conditions that had existed from childhood made her a fit subject for many causes to produce the symptoms testified to.

In the opinion, Kerns v. Dykes, 48 S. W. (2d) it is said:

''If the injuries may have resulted from one of two causes, for one of which alone the defendants are liable, it was incumbent on plaintiff to show with reasonable certainty that the cause for which they were liable produced the injury.''

Citing Sharp v. Steubner C. & M. Co., 300 S. W. 559, wherein it is said:

''If the injury may have resulted from one of two causes, for one of which, and not the other, the defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the .result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action.'' [Coin v. Lounge Co., 222 Mo. 488, 508, 121 S. W. 1, 6; 25 L. R. A. (N. S.) 1179, 17 Ann. Cas. 888.]

Based upon the above, we conclude as a second reason for our conclusion that the evidence in this case fails to meet the requirements of the law, as the evidence in this case is to the effect that the plaintiff's condition of health could have resulted from many causes.

A further reason for our conclusion in this case arises from the fact that there is no evidence shown that supports the plaintiff's contention that it was negligence on the part of the defendant to fail to provide respirators for employees.

No doubt a sponge to the nose would be advantageous to persons afflicted, as plaintiff appears to have been since her childhood, whether walking on the street or working in the fields or where employed in any industry where dust of any kind might be present. The evidence in this case does not disclose conditions peculiar to the industry, but

on the contrary discloses conditions common to many industries and many occupations.

For reasons given, we conclude that no case was made for the jury and that it was error to refuse peremptory instruction at the close of all the evidence.

The judgment is reversed. All concur.