WADIES EVANS, EMPLOYEE, RESPONDENT, v. CHEVROLET MOTOR COMPANY, A CORPORATION, EMPLOYER, AND SELF-INSURER, APPELLANT.—105 S. W. (2d) 1081.

St. Louis Court of Appeals. Opinion filed June 1, 1937.

Motion for Rehearing Overruled June 15, 1937.

*Hay & Flanagan* and *Robert W. Herr* for respondent.

*McCarthy, Morris, Smith & Sparrow* for appellant.

*Warren E. Talcott* of counsel.

BENNICK, C.—This is an appeal by the employer and self-insurer from the judgment of the Circuit Court of the City of St. Louis affirming an award of the Workmen's Compensation Commission in favor of the employee. Originally the appeal was allowed to the Supreme Court, but for want of an affirmative showing in the record that the amount in dispute was within that court's pecuniary jurisdiction, it ordered the cause to be transferred here. [Evans v. Chevrolet Motor Co. (Mo.), 102 S. W. (2d) 594.]

The case involves a claim for compensation for a permanent total disability alleged to have resulted from an occupational disease contracted by the employee as an incident to his employment. It was admitted that following the amendment of 1931 (Laws 1931, p. 382), the employer had duly elected to bring itself within the act with respect to occupational diseases.

The employee is one Wadies Evans, now about forty-three years of age, while the employer is the Chevrolet Motor Company, which maintains one of its plants in the city of St. Louis.

Evans was employed as a porter in June, 1932, and was subsequently assigned to the work of cleaning booths at nighttime. These booths apparently were rooms or enclosed portions of the plant about fourteen by twenty-five feet in dimension, in which automobile hoods were painted or "ducoed" during day shifts. The nature of the work required that all dust in the booths be removed or eliminated, and on night shifts the porters, including Evans, after cleaning the booths, would spray the walls and ceilings with a spray gun or

soap gun, using an aqueous solution made up of soap chips, water, and whale oil. The night shift extended over a period of seven hours, with two hours of each shift given over to the use of the spray guns, and Evans had been so employed about ten months at the time he took sick on October 12, 1934.

The evidence was that while the spraying was being done the booths would be filled with a mist or fog which was sometimes so heavy or dense that one could not see through it. In fact the employer's own evidence corroborated that of Evans with respect to the density of the mist or fog when the spray guns were being used. Nothing in the way of respirators was furnished the porters by the company, and the only protection which they had against the inhalation of the mist came from pieces of cheese cloth which they wore across their nostrils.

A chemical analysis made of the solution used in the spray guns disclosed that it contained a twenty-seven per cent. concentration of solid matter, the greater proportion of which was soap, and that while the solution contained no poison as such, the extent of the concentration of solid matter in it served to cause it to have a harmful effect on human tissue, and to produce an irritation and inflammation in the respiratory system if inhaled over a period of time. It was also shown that the condition attending the use of the solution was one "peculiar to the work," and that the question of what the effect of it would be upon a particular individual depended upon how well that individual's physical make-up would be enabled to repair and take care of the damage that would be done.

Evans testified that after he had been using the spray gun about two months he began to notice an irritation in his throat and lungs; that the effect was one of a "burning sensation and grittiness;" and that of mornings he would blow solid particles of the solution out of his nose. For the last two months that he was on the job he felt very badly, and on October 12, 1934, he became sick and consulted his family physician, Dr. A. W. Cheatham, by whom he was ordered to bed, where he remained until about the first of the following year.

To elaborate upon the details of the diagnosis and treatment of Evans' ailment would serve no useful purpose in this proceeding. Suffice it to say that his "chief trouble is tuberculosis," with myocarditis as a contributing factor, and that his disability resulting therefrom is both total and permanent.

What is of most importance upon the question of Evans' right to receive compensation is the fact, as shown by his medical evidence, that his disability is directly attributable to his employment, the continued inhalation of the irritating substance having served to set up a chronic inflammation of the lung tissues of a character to have lowered his resistance to infections of any sort and to have produced a fertile soil for the growth and development of the tubercular ba-

cilli. Moreover, as corroborative of the fact of causal connection between the employment and the disability, it was shown, not only that Evans' health had been good until the time of his exposure to the hazard incident to his employment, but also that his case history disclosed no other factor to account for the lowering of his resistance and the attendant development of the tuberculosis.

The commission awarded Evans the sum of $275 for medical aid not furnished by the employer, and for permanent total disability the sum of $14.67 a week for three hundred weeks, and thereafter the sum of $6 a week for life. The appeal of the employer and self-insurer has run the course that has already been indicated.

The employer argues that there was no showing that the disease contracted by Evans was peculiar and incidental to his employment, and that for want of such proof he must be held to have failed to make a case entitling him to compensation for a disability resulting from an occupational disease within the meaning of the act.

As the compensation law was originally enacted, it was specifically provided (sec. 3305 (b), R. S. Mo. 1929; Mo. St. Ann., sec. 3305 (b), p. 8238) that the terms "injury" and "personal injuries" should "in no case be construed to include occupational disease in any form," nor should they be construed to include "any contagious or infectious disease contracted during the course of the employment." Instead the application of the terms was expressly limited to "violence to the physical structure of the body and such disease or infection as naturally results therefrom," which meant, of course, that prior to the amendment of 1931, for an employee to be entitled to receive compensation for disability attributable to disease, it was incumbent upon him to show that such disease, whatever its form or character, had proximately resulted from an accidental injury arising out of and in the course of the employment. [Rinehart v. F. M. Stamper Co., 227 Mo. App. 653, 55 S. W. (2d) 729; Meldrum v. Southard Feed & Mill Co., 229 Mo. App. 158, 74 S. W. (2d) 75.]

Then came the amendment of 1931, providing that employers might elect to bring themselves within the act with respect to occupational diseases, but saving to employees, in the absence of such an election by the employer, all rights possessed under the laws of this State pertaining to occupational diseases. So now the situation is that not only does the commission still retain its former jurisdiction to award compensation for disability resulting from accidental injuries arising out of and in the course of the employment, but it also has the added jurisdiction, in those cases where the employer has brought himself within the act, to award compensation for disability resulting from occupational diseases, and this, of course, upon the mere showing of the presence of the disease and its relation to the employment, all question of accident being obviously eliminated from the case

where the injury to the employee falls within the category of an occupational disease.

This brings us then to the question of what is meant by the term "occupational disease" as the same is used in defining that new character of injury for which the commission has been authorized to award the same measure of compensation as is otherwise fixed for disability resulting from accidental injuries. Was the term intended to comprehend any and all character of disease, whether peculiar and incidental to the employment or not, so long as proof might be available of a causal connection between the work and the disease, or has it been rather employed in the restricted and limited sense of a disease which is peculiar and incidental to the nature of the particular employment, leaving all other types of disease to be compensated for, if at all, only where the facts and circumstances attending their contraction are such as to warrant their classification as accidental injuries?

As to this it is a significant fact that for the purpose of determining what the application of the compensation act shall be the Legislature has itself divided diseases into two classes, the first, occupational diseases as such, and the second, contagious or infectious diseases contacted during the course of the employment, but lacking those characteristics entitling them to be regarded as occupational diseases. [Miller v. St. Joseph Transfer Co., 224 Mo. App. 1114, 32 S. W. (2d) 449.] In other words, it is apparent, we think, that occupational diseases are spoken of in the act in the same definitely restricted and limited sense as that in which they have heretofore come to be regarded, while the contagious and infectious diseases referred to in the act as giving rise to no right to compensation even though contracted during the course of the employment are such diseases as are not to be placed in the category of occupational diseases, but are encountered in some manner independent of an accident in connection with the work of the employee. [Rinehart v. F. M. Stamper Co., *supra.*]

Now an occupational disease, in its ordinary and accustomed sense, is a disease which is the natural incident or result of a particular employment, usually developing gradually from the effects of long continued work at the employment, and serving, because of its known relation to the employment, to attach to the same a risk or hazard which distinguishes it from the ordinary run of occupations and is in excess of that attending employments in general. [Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W. (2d) 323; Downey v. Kansas City Gas Co. (Mo.), 92 S. W. (2d) 580; Lovell v. Williams Bros. (Mo. App.), 50 S. W. (2d) 710; Maupin v. American Cigar Co., 229 Mo. App. 782, 84 S. W. (2d) 218; Miller v. St. Joseph Trasfer Co., *supra*; 71 C. J. 599.]

So the employer is correct in insisting that it was essential for Evans to show, as a condition to his right to receive compensation,

that his disease was peculiar and incidental to the nature of his employment, but even so, there was sufficient competent evidence adduced to support the findings of the commission.

His medical evidence, along with all the facts and circumstances of the case, disclosed a direct causal connection between Evans' physical condition and the peril incident to his employment by reason of his continued exposure to the irritating properties of the soapy solution he was required to use at his work. In other words, the natural consequence of his employment was to set up chronic inflammatory processes in his respiratory system, and thereby to render the same particularly susceptible to the growth and development of the tubercular bacilli. The result is that he is now to be regarded as suffering from an occupational disease within the meaning of the act, and thus entitled to receive that measure of compensation which the extent of his disability warrants. [Wenrich v. Warning, 182 Wis. 379, 196 N. W. 824; Wurst v. American Car & Foundry Co. (Mo. App.), 103 S. W. (2d) 6, 16.]

There is the bare suggestion in the employer's brief that the claim should be barred because of Evans' failure to have given written notice of his injury or condition within the thirty-day period as required by section 3336, Revised Statutes, Missouri, 1929 (Mo. St. Ann., sec. 3336, p. 8268). Under the facts of the case this point is not well taken. While it is true that the written notice called for by the statute was not given, the fact is that not only was the employer shown to have had timely actual notice, but indeed the claim itself was filed with the commission, and the employer's answer made to it, all within the thirty-day period. In view of all such circumstances, the burden was upon the employer, if it was serious in urging the point, to show that notwithstanding the actual notice which it had, it had nevertheless been prejudiced in some material manner by a failure to have received the technical statutory notice, and no showing of prejudice having been made, the claim is not to be barred because of Evans' noncompliance with the statutory requirement. [State ex rel. v. Haid, 330 Mo. 1030, 51 S. W. (2d) 1008; Schrabauer v. Schneider Engraving Product, 224 Mo. App. 304, 25 S. W. (2d) 529.]

Finally it is insisted that there was no basis for the award of $275 for medical expenses not furnished by the employer, the contention being that inasmuch as Evans was shown to have selected his own physician, he should be required to bear the expenses of the treatment he received.

While the act accords the employer the privilege in the first instance of choosing the physician or agency to render the medical treatment required by virtue of its provisions, still if he neglects or refuses, by reason of a denial of liability or otherwise, to provide such medical treatment, the employee need not lie helpless, but may select his own physician and have the commission assess the costs of

the treatment he receives against the employer, limited, of course, by the provisions of the act in such respect. [Klasing v. Fred Schmitt Contracting Co., 335 Mo. 721, 73 S. W. (2d) 1011, 1016; Schutz v. Great American Insurance Co., 103 S. W. (2d) 904.]

Here there was evidence to show that the employer knew both of Evans' illness and of his claim that the same was attributable to his employment, and whether the employer should be held to have refused to furnish treatment, or whether it should be held to have impliedly acquiesced in the physician selected by Evans himself, the item of medical expense was in either event properly recoverable as a part of the compensation award.

Along with the case has been taken respondent's motion to dismiss the appeal. This may be overruled without further comment.

It follows that the judgment of the circuit court affirming the award of the commission should in turn be affirmed by this court, and the Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. Respondent's motion to dismiss the appeal is, accordingly, overruled, and the judgment of the circuit court affirmed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.