260 S.W.2d 815 (1953)
SAMS
v.
HAYES ADHESIVE CO. et al.
No. 28625.
St. Louis Court of Appeals. Missouri.
September 15, 1953.
*816 Mills & Palumbo, St. Louis, for appellant.
John S. Marsalek, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for respondents.
ANDERSON, Judge.
This case arose under the Missouri Workmen's Compensation Act, Section 287.010 et seq. RSMo 1949, V.A.M.S., and is an appeal by an employee from a judgment of the Circuit Court of the City of St. Louis affirming an award of the Industrial Commission. By said award the employee was granted temporary total disability in the sum of $25 per week for the period of thirteen weeks, but was denied recovery for medical expense. In this court, appellant contends that, under the facts as disclosed by the record, he is entitled to an award for permanent partial disability in the sum of $3,500, computed on the basis of 35 per cent of 400 weeks at $25 per week, plus the sum of $362.89 for medical expenses incurred.
The employee, Homer Sams, aged 46, was employed by Hayes Adhesive Company as a laborer. His job consisted of loading a mixing machine with starch. The starch was contained in 100 pound bags which were stacked twelve bags high in the vicinity of the mixer. Claimant testified that on February 1, 1951, while he was engaged in loading the mixer, he reached for a bag of starch located on top of the pile and the whole pile fell on him. He stated he was knocked to the floor and that he immediately felt a sharp pain in his right side. An examination of his person at the time revealed a red area and "a little knot sticking out there."
Lawrence Lorton, a fellow employee, testified that, at the time, he heard claimant shout for help, and "this colored fellow and I went over to him and he was lying on the floor with his head against the mixer; the sack was on top of him. We got the sack off and asked if he was hurt and he said he had pain on the right side. He lowered his trousers and there was a big knot on the right side. * * * it looked like a hernia to meon the right sideit was red looking and puffed."
Ten or fifteen minutes later claimant went to see Mr. Vernon Hayes, one of his employers, and told Mr. Hayes that he had been hurt, and stated to Mr. Hayes: "I got hurt, do you want to see it?" Hayes said, "No, don't show it to me, go to the doctor." Hayes told claimant to go to Dr. Flynn. Claimant went to see Dr. Flynn that same day at his office in the Missouri Theatre Building. Dr. Flynn examined claimant and told him that he would require hospitalization and a skin graft.
It further appears from the evidence that the protrusion claimant suffered on the occasion in question appeared at the site of an appendectomy which he had had several years before. Subsequently, and in March, 1950, and again in September, 1950, he suffered hernias in this same region. These hernias were repaired by operations performed by Dr. Flynn. In December, 1950, claimant received a lump sum settlement of his claim against respondents for compensation on account of the two previous hernias.
Later, claimant decided he wanted to consult Dr. Michael Dulick with reference to his condition, but, before doing so, had a talk with Mr. Hayes about it. When informed of claimant's desire to see Dr. Dulick, Mr. Hayes said: "That's your privilegego to any doctor you want to."
*817 Claimant then saw Dr. Dulick, but the doctor was unable to get claimant into a hospital at that time. Claimant continued to work at the Hayes Adhesive Company until March 2, 1951. He entered St. John's Hospital on March 5, 1951, and was operated on there by Dr. Dulick for a recurrent post-operative ventral hernia. The hospital bills amounted to $212.89, and were made out against claimant. After leaving the hospital claimant saw Dr. Dulick at intervals until May 31, 1951. Dr. Dulick's bill for services was $150.
Appellant was off from work until June 4, 1951, when he obtained a job at Scullin Steel Company. At the time of the hearing he had been working for Scullin Steel Company for eight months. His duties there were that of maintenance work. He did no heavy lifting. He repaired furnaces and machinery, took machinery apart, washed and oiled machinery, and installed bearings. At the Scullin Steel Company he received $1.42 per hour, and worked forty-eight hours per week. At the Hayes Adhesive Company his wages were $46 per week.
Dr. Michael Dulick testified that he saw and examined claimant on February 21, 1951, at which time he made a diagnosis of post-operative ventral hernia, recurrent. The doctor stated that during the examination he directed the claimant to take a deep breath and hold it, then to strain in the lower part of his abdomen, and that when claimant did as directed there was a protrusion through an operative scar. He further testified that claimant told him he had been operated on three timesthe first operation being an appendectomy many years previously; that later he had developed a rupture through the appendectomy scar and was operated on and was pronounced cured by his surgeon; that several months later he had a recurrence of the protrusion through the same operative scar and was again operated on and pronounced cured. Dr. Dulick further testified that he was able to reduce the protrusion back into the abdomen and, at said time, could feel a definite hole in claimant's abdominal wall.
Dr. Dulick operated on claimant on March 6, 1951, at St. John's Hospital in St. Louis. Claimant was confined in the hospital after the operation for a period of eleven days. Dr. Dulick saw claimant every day during the time the latter was in the hospital, and about once a week thereafter for a considerable period of time. Dr. Dulick advised claimant to wear a belt which would protect the weak abdominal wall, and told claimant he would have a weak abdominal wall the rest of his life. The doctor advised claimant not to do any more lifting for the rest of his life, but also told claimant that possibly after a few years, if his abdominal wall still remained as it was, he might some day be able to do heavy lifting.
Dr. Dulick further testified that the diagnosis which caused him to place a limitation on claimant's activities was, "weakened abdominal tissue in the immediate area of the operationit is scar tissue. I had a difficult time repairing thatit was not as strong as I would expect to find in a normal man, considering his makeuphis anatomical makeup. * * * the weakened tissue would be permanent in my opinion. * * * Realizing the man had been operated on in the same area four times; I would place a percentage of twenty-five to thirty-five per cent weakness. In other words, if there had been nothing done to that area, we would consider that one hundred per cent normal. But I would say there is twenty-five to thirty-five per cent weakness."
Dr. Dulick, in answer to a hypothetical question, stated that in his opinion there was a direct causal connection between the condition he found and the accident which claimant suffered.
On cross-examination, Dr. Dulick testified that claimant made a good recovery from his operation; that he felt there was soft or weak tissue on the right side and that:
"As of now, I am of the opinion this may be permanent because of the weakened tissue being operated on in that area four times. The tissue cannot *818 be normal. I have operated on that area once myself, and I know what the tissue is like. My opinion is it's weakened and will be weakened.
"Q. This came about by the appendectomy? A. Yes."
The doctor further testified that he would say that claimant was "disabled twenty-five to thirty-five per centdisabled for heavy work. * * * I am still saying he has a permanent disability, because of the weakened tissuethat's my opinion. If he stays under my care, he will have to avoid heavy work or he may have another hernia. It's still permanent. Maybe ten years from now he may be all rightI would say no, but I don't know what the future holds. * * * It is permanent."
Dr. Richard Graeser made an examination of claimant on November 5, 1951. He testified for respondents as follows:
"Q. What were your findings on examination? A. I just as well read my report here. It essentially covers the findings. `Examination of the abdomen and abdominal wall reveals a 6-inch long healed scar in the right groin, which is the result of the herniotomy performed in March, 1951. The abdomen is soft with no palpable masses and no evidence of any rebound tenderness. Examination of the right groin reveals a well healed inguinal region with no evidence of any weakness in the abdominal wall and no evidence of any bulge or impulse with increased intra-abdominal pressure.' That means when I examined this man for a possible hernia, I didn't see a bulge and I couldn't feel any impulse when I inserted my finger into the region of the inguinal rings, while he increased abdominal pressure by coughing. `The left groin reveals normal findings with no evidence of any hernia or any enlarged inguinal ring.'"
When asked if he found that claimant had made a good recovery from the operation of March 6, 1951, the doctor answered:
"I would say he made a good recovery inasmuch as I couldn't find a hernia at that timeeight months afterwardsthere was no hernia present I couldn't find any bulge as I mentioned before. Of course, you see the scar thereotherwise there was no evidence that the hernia or the repair of the hernia didn't hold up at that time. I would say it is a successful surgical repair of a recurrent hernia.
"Q. Did you come to any conclusion, Doctor, based on your examination of the man, the history and reasonable medical certainty, whether or not the man is able to do reasonable work since this operation? A. I recall looking over my conclusion'The above described clinical findings indicate that the examined has a good recovery after a surgical repair of a right recurrent inguinal hernia. In my opinion there is no reason why the examined should wear a supportive belt and should be able to do his regular work.' "
On cross-examination, Dr. Graeser tesfied:
"Q. After this examination you concluded he could perform heavy labor without limit? A. I think so. I'm basing it on my findings at that time. I imagine it will hold upbut anything could happen. But I would say from my findingswhat I know about itI would say he should do regular work without any support.
"Q. You say that with the fact in mind that his regular work had been lifting hundred pound bags all day long and carrying them unaided? A. Yes, I would say so."
D. Graeser further testified that "due to the repair claimant did not have the normal tissue there." He stated:
"Normal tissues, in the histological sense he doesn't have because he has scar tissue there.
"Q. Is scar tissue as good as he had before? A. If they hold they are *819 just as goodthey are not the same tissue but they serve the purpose.
"Q. They are not as strong? A. Well, if you make a repair with scar tissue and it holdsI don't say it is normal tissue but it is adequate support to prevent the bulge."
Dr. Graeser further testified that he disagreed with the opinion that had been expressed by Dr. Dulick that the claimant had a permanent disability.
There was evidence introduced by respondents tending to show that claimant did not sustain an accident within the meaning of the Workmen's Compensation Act. Respondents also offered evidence that appellant, in a statement made to a claims adjuster, said that after seeing Dr. Flynn he heard that Dr. Dulick was a good doctor and that Mr. Hayes did not send him to see Dr. Dulick.
The Referee of the Division of Workmen's Compensation found that claimant did not sustain an accident arising out of and in the course of his employment, and denied the claimant compensation. Upon application for review, the Industrial Commission made a final award reversing the Referee on the issue of accident, and awarded the claimant $325 for temporary total disability of thirteen weeks, and denied the claim for medical expenses. The Circuit Court affirmed the award of the Industrial Commission.
The question presented by this appeal is whether the findings and award of the Industrial Commission are supported by competent and substantial evidence upon the whole record. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647. We cannot substitute our own judgment for that of the Commission, but must affirm the judgment unless it clearly appears that the Commission could not reasonably have made said finding. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Karch v. Empire District Electric Co., 358 Mo. 1062, 218 S.W.2d 765.
It must also be borne in mind that where the right to compensation depends upon the acceptance of one of two conflicting medical theories, the question to be determined is one of fact for the Industrial Commission. Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657. And, we are not at liberty to disturb said finding unless the Commission acted unreasonably by accepting evidence which was not substantial, or decided the case contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647.
We have examined the record in this case and have come to the conclusion that there is substantial evidence contained therein from which the Commission could reasonably have found that claimant was not entitled to an award for permanent partial disability.
It is true that claimant presented testimony which, had it been accepted by the Commission, would have supported an award in claimant's favor. But the Commission was not compelled to believe this testimony. The Commission was at liberty to reject all or any part of the testimony which it did not consider credible, and accept as true contrary evidence adduced by the respondents. The Commission also had the right to accept parts of the testimony of the physician testifying for claimant, and the physician who testified for respondents,it being the province of the Commission to resolve conflicts in the evidence and give probative value to only that part which has the ring of truth in it.
Dr. Graeser testified he found no evidence of weakness in claimant's abdominal wall, and no evidence of any bulge or impulse with increased abdominal pressure. The doctor's conclusion was that claimant had a good recovery from his last operation; that there was no reason why he should wear a supportive belt, and no reason why claimant should not be able to do his regular work. He also stated that *820 he disagreed with the opinion expressed by Dr. Dulick that insured had a permanent injury.
Dr. Dulick's opinion that claimant suffered permanent injury was based upon the doctor's belief that claimant had "weakened abdominal tissue in the immediate area of the operation." This tissue was referred to by both doctors as "scar tissue". According to Dr. Graeser's testimony, this scar tissue was "adequate support to prevent the bulge." Thus we have a conflict between the two doctors on the ultimate issue to be determined. It also appears that Dr. Dulick testified on cross-examination that the weakened condition of the tissues was the result of the appendectomy. We cannot say that the Commission acted unreasonably in accepting the medical theory advanced by Dr. Graeser.
Appellant also contends that the Commission erred in finding that the employer and insurer were not liable for his medical expense.
The question relating to the claim for medical benefits is one of fact for the Commission. Richter v. Multiplex Display Fixture Co., Mo.App., 127 S.W.2d 783; and the Commission's finding is to be reviewed in the same manner as any other issue of fact. On this issue, the burden of proof and persuasion was upon the claimant. Smith v. Braudis, 234 Mo.App. 1237, 123 S.W.2d 223.
Immediately after claimant sustained his accident he reported to Mr. Hayes and told Mr. Hayes that he had been injured. Mr. Hayes directed the claimant at that time to see Dr. Flynn, the company doctor. Claimant consulted Dr. Flynn and was told by the doctor that his condition required hospitalization and a skin graft. Claimant then decided he wanted to consult Dr. Dulick, and so informed Mr. Hayes. Hayes replied: "That's your privilege go to any doctor you want to." Mr. Hayes made no statement to appellant that respondents would pay for Dr. Dulick's services, nor did claimant make any request that the company agree to do so. Later, claimant appeared at the office of the insurance carrier and talked to Mr. Wende, an adjuster. According to Mr. Wende, he and claimant went over the case, and Mr. Wende wrote out appellant's statement. Appellant read this statement and said it was true, but that he would rather not sign anything. On this occasion, appellant related that he had seen Dr. Flynn at Mr. Hayes' suggestion. With respect to Dr. Dulick, appellant said: "I saw Dr. Michael Dulick, Manchester Avenue. He operated on me. At present I am recuperating. I heard that this doctor was a good doctor and so I saw him. Hayes did not send me to this Doctor."
From the foregoing evidence the Commission found that there was an election by the claimant to select his own physician at his own expense. We cannot say that in drawing the necessary inference to make said finding the Commission acted unreasonably, or that said finding was against the overwhelming weight of the evidence. But appellant contends that respondents were estopped from denying liability for medical expense because the respondents, in their answer to the employee's claim, denied that the latter had sustained a compensable injury. In support of this contention, appellant cites O'Malley v. Mack International Motor Truck Corp., 225 Mo.App. 1, 31 S.W.2d 554; Beatty v. Chandeysson Electric Co., 238 Mo.App. 868, 190 S.W.2d 648; and Evans v. Chevrolet Motor Co., 232 Mo.App. 927, 105 S.W.2d 1081. The rule contended for was applied in those cases, but the facts in the case at bar take the instant case from under the rule announced in said cases cited by appellant.
Mr. Hayes did not refuse claimant medical attention. Within fifteen minutes after the accident he advised claimant to see Dr. Flynn, the company doctor. The alleged conversation between Mr. Hayes and claimant relative to the latter obtaining his own physician took place some time before the claimant's operation, which was performed on March 6, 1951, and before the claim was filed on June 8, 1951. There *821 is, therefore, no basis for the contention that because respondents, in June, 1951, filed an answer denying the claim, they would have refused medical aid in March, 1951. The evidence is to the contrary. Respondents actually did furnish medical aid.
In our opinion, the judgment should be and is hereby affirmed.
BENNICK, P. J., and RUDDY, J., concur.