(No. 25908.—

THE STEWART WARNER CORPORATION, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MAE MAHER *et al.* Defendants in Error.)

*Opinion filed February 14, 1941—Rehearing denied April 8, 1941.*

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, (HOWARD ELLIS, DAVID T. SMITHSON, DAVID JACKER, and WILLIAM H. SYMMES, of counsel,) for plaintiff in error.

PHILIP ROSENTHAL, and GREENBERG & SACHS, (JACK L. SACHS, of counsel,) for defendants in error.

Mr. JUSTICE MURPHY delivered the opinion of the court:

The arbitrator allowed the widow and dependent children of Edward Maher compensation for a claim made under the Workmen's Occupational Diseases act. (Ill.

Rev. Stat. 1939, chap. 48, pars. 172.1, *et seq.*) The Industrial Commission heard additional evidence and sustained the findings of the arbitrator. On *certiorari,* the circuit court of Cook county confirmed the order of the commission. A writ of error was granted and the record is here for further review. The question is, did Edward Maher die of an occupational disease?

Plaintiff in error was engaged in the manufacture of refrigerators. Deceased entered its employment in November, 1936, and worked until February 26, 1938. During the greater part of that period he was engaged in testing refrigerators and trucking them to and from the testing room. The temperature in the testing room ranged from a minimum of 90° to a maximum of 110°. It was heated by currents of hot air driven into the room by electric fans, thermostatically controlled. The temperature of the building outside the testing room was from 30° to 60° lower than the temperature of the testing room. In trucking the refrigerators to and from the testing room it is estimated that the deceased passed from one room to the other approximately two hundred times a day.

The refrigerant used was sulphur dioxide and at times it escaped from the refrigerators into the testing room. There is a conflict in the evidence as to the amount of the sulphur dioxide gases in the air and the frequency with which it occurred, but it is clear that there were times each day when there was a sufficient amount to cause sneezing, coughing and at times the ones in the room were forced to leave for a short period.

Prior to deceased's employment by plaintiff in error he was active, strong and well. There is evidence that after he had been employed for about six months, he began losing weight and coughing. Thereafter he became weak and, in 1938, began to suffer from night sweats. It does not appear he lost any time from his employment on account of physical ailment nor that the employment was terminated by reason of his illness or weakened condition. He did not

engage in any other work after he was employed by plaintiff in error: About four months after he ceased work he was treated by a physician and it was found that he had a temperature of 103, accompanied by a cough. The ailment was diagnosed as a respiratory infection. Later, a *sputum* examination disclosed tubercle bacilli. He was taken to the Municipal Tuberculosis Sanitarium of Chicago where he died September 28, 1938. The cause of death was pulmonary tuberculosis.

A hypothetical question was propounded to the medical experts who testified for the respective parties and in it they were asked if they had an opinion as to whether there might or could be, with reasonable medical certainty, a direct causal connection between the conditions under which the work was performed and the physical condition of the deceased. The doctors testifying for defendants in error said, in substance, that in their opinion the deceased had an old tuberculosis which had not interfered with his mode of living or work; that the coughing and sneezing brought about by inhaling the sulphur dioxide gases and the constant intermittent chillings of the body caused him to lose weight, and his resistance to germs was thereby lowered, and that an acute respiratory infection developed which reactivated the old tubercular process and that the working conditions thereby had a direct influence on his death.

The medical experts testifying for plaintiff in error agreed that in all probability the deceased had carried the tubercular germ for a period of time, perhaps years, and that reduced physical strength and lowered resistance was likely to reactivate tubercular germs, but in their opinion the intermittent changes of temperature and the breathing of the sulphur dioxide gases did not have any effect on deceased's physical condition. Plaintiff in error offered some evidence that deceased had been seen intoxicated while working for it and such evidence was incorporated in the hypothetical question. Their medical experts assigned alcoholism as the cause for the loss of weight and

lowered resistance but, on rebuttal, defendants in error so thoroughly disproved the charge of alcoholism that no further attention need be given such claim.

The X-ray readings of the doctors for the respective parties are not in serious conflict. They all agree that the deceased had pulmonary tuberculosis.

In the application for adjustment of claim filed before the commission, in answer to what was the general nature and character of illness, it was alleged to be "illness from gas fumes." The decision of the arbitrator did not set forth the specific cause of death but stated that it was found that the deceased, in his employment, was exposed to the hazards of an occupational disease. The order of the commission confirmed the finding of the arbitrator.

Plaintiff in error contends that pulmonary tuberculosis is an ordinary disease of life and is not compensable under the Workmen's Occupational Diseases act, and that there is no evidence to support a finding that the deceased died from an occupational disease. Defendants in error say that the intermittent changes of temperature to which deceased was exposed, the intense heat in the testing room and the inhaling of the fumes of the sulphur dioxide, affected his physical condition by reducing his weight, lessening his vitality and lowering his resistance, thus reactivating the tubercle bacilli and causing tuberculosis. They say the only possible question is as to whether the findings of the commission are contrary to the manifest weight of the evidence.

Section 6 (par. 172.6) of the act defines the term "occupational disease" to mean "A disease arising out of and in the course of the employment." The section further provides, in substance, that a disease shall be deemed to arise out of the employment only when it is apparent to the rational mind from a consideration of all the circumstances that there is a direct causal connection between the condition under which the work was performed and the disease, and it can be seen that the occupational disease followed

as an incident of the work as a result of the exposure occasioned by the nature of the employment and that the proximate cause of the disease can be fairly traced to the employment. The hazard cannot be such as workmen would have been equally exposed to outside of the employment. The disease must be incidental to the character of the business and arise out of the relation of employer and employee. The disease need not be foreseen or expected but, after its contraction, it must appear to have had its origin in a risk connected with the employment and to have flown from that source as a natural consequence.

The medical experts agree that tuberculosis is a germ disease; that it is caused by tubercle bacilli, that after the germ enters the body it may remain inactive for years and possibly never cause trouble. Medical science has not been able to determine when a tubercular germ enters the body nor the length of time it lies dormant before becoming active. There are persons of all ages and in all walks of life who have tubercular bacilli in their bodies. There is no proof that the germ infection was a hazard of the work in which deceased was engaged. Proof that the hazards of the employment produced a weakened physical condition and a lowered resistance to germs does not establish that such a hazard was the direct cause of the tuberculosis. It is well known that there are many things that weaken the physical condition and lessen the resistance to germs which are not in any way related to an employment. Even though the temperature changes and the sulphur dioxide gas caused the change in the deceased's physical condition, it does not follow from such proof that tuberculosis had its origin in the hazards of the employment and that it came from such hazard as a rational consequence as is required by the statute. It is a disease referred to in the statute as one of the ordinary diseases of life to which the general public is exposed outside of employment. The second sentence of section 6, *supra,* provides that the "ordinary diseases of

life * * * shall not be compensable except where the said diseases follow as an incident of an occupational disease as defined in this section." There is no proof that deceased had an occupational disease to which the tuberculosis might be an incident. Defendants in error contend that there is proof that he was poisoned by the breathing of the sulphur dioxide gases. Such statement is based upon the testimony of their medical expert, the strongest statement in their favor being as follows: "The sulphur dioxide itself would not cause the tuberculosis but it would cause an activation; * * * sulphur dioxide in itself would probably cause very little harm but in the presence of a temperature of 100 or 110, presence of moisture of the nose and throat itself, the sulphur dioxide on the respiratory tract, the moisture has a tendency to change to sulphuric acid, which would have a caustic action, causing damage to the lung tissues, then there would be a gradual infection of the respiratory tract, causing an irritating condition which would help the germs in the lung tissue to become active." Such evidence merely shows conditions which will activate tubercle bacilli and cause tuberculosis. It does not show that he was poisoned or that he had an occupational disease.

A case coming within the definition is well illustrated in *Hansell-Elcock Co.* v. *Industrial Com. post*, p. 151. In that case the employee had silicosis which was an occupational disease and the evidence showed that, as an incident to the silicosis, tuberculosis developed.

Under the evidence in this case defendants in error did not prove that the deceased died of an occupational disease and the circuit court erred in confirming the award of the commission.

For the reasons assigned, the judgment of the circuit court is reversed and the cause remanded, with directions to set aside the award.

*Reversed and remanded, with directions.*