(No. 26211.—

Valentine Kniat, Defendant in Error, *vs.* The Industrial Commission *et al.*—(Swift & Company, Plaintiff in Error.)

*Opinion filed November 18, 1941.*

KITCH, MOORE & GOFF, (ROBERT M. MOORE, and FREDERIC L. GOFF, JR., of counsel,) for plaintiff in error.

JOSEPH W. KOUCKY, for defendant in error.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Valentine Kniat filed her application for adjustment of claim for compensation under the Occupational Diseases act to which she claims she was entitled as a result of the death of her husband, Frank Kniat. The arbitrator found that Kniat had slowly and insidiously developed a hernia due to periodic strains while lifting various articles of varying weights in the course of his employment with the respondent over a period of years, and that such hernia constituted an occupational disease as contemplated by section 6 of the Workmen's Occupational Diseases act. (Ill. Rev. Stat. 1941, chap. 48, par. 172.6.) This award was set aside by the Industrial Commission. Upon *certiorari* the circuit court of Cook county set aside the decision of the commission and ordered compensation paid in accordance with the award of the arbitrator. The cause is here through our allowance of a petition for writ of error to the circuit court. The question is, was the hernia which led to deceased's death an occupational disease?

Kniat had worked for plaintiff in error for ten or twelve years in different capacities. He had served successively as millwright, machinist, oiler and elevator operator. In May of 1938, he worked three days in plaintiff in error's sweet pickle cellar and was then assigned to the clean-up gang, at which job he worked until January 3, 1939. Claimant testified that deceased injured his right side in May when he fell and split his head in the sweet

pickle room, and came home that night complaining of a pain in his right side. He then bought a truss or athletic support, which he wore to work until January 3, 1939. She testified that for about two months prior to said date she was called upon to rub his side, and that about a month before that time there was a lump on his right side about the size of a hen's egg, and that it gradually became larger. He came home about midnight January 3, 1939, and his side was too sore to permit rubbing. She then called Dr. Lownik. He examined Kniat and found a swelling in his right lower abdomen, the inguinal region, which was a little larger than a hen's egg. Dr. Lownik treated him and in the morning of January 6, 1939, operated on him. Deceased developed post-operative pneumonia from which he died January 11. Dr. Lownik testified Kniat had a chronic hernia, and that this hernia had existed for a number of months as a simple hernia prior to the strangulation that occurred on January 5. He testified an acute hernia is one produced by a specific act, and a chronic hernia is one that results over a long period of time from gradual weakening of the abdominal wall at whatever part it may be, due to constant exertion, muscular strain, etc.

Deceased, at the time of his death, was 48 years old and weighed 142 pounds. As a member of the clean-up gang his duties were to sweep the meat off the killing floor and spray the floor with hot water. Once a week the gang would use steel wool on all the equipment. They would wash the tables with hot water and once a week with a mixture of hot water and soda ash. They carried water in 10-quart pails. They placed the said refuse in two-wheeled hand-trucks, which were about 4 feet long, 3 feet wide and 2½ feet deep. A truck thus fully loaded might weigh as much as 500 pounds. It would depend on how heavy the load was whether one or two people handled it. The weight was balanced in the center and the trucks were seldom full. The employees pushed the trucks to a chute

to unload them and to do this would lift up the rear of the truck. The front was in the shape of a half-moon and this tilting would cause most of the refuse to fall out. The person in charge would empty the remainder with a long-handled rake. It required from 20 to 25 pounds lifting to empty the truck. In cleaning the platforms used for butchering it was necessary to do some climbing, using either steps or ladders. The clean-up gang also moved perforated table tops by lifting them and leaning them against tables. The tops weighed from 5 to 25 or 30 pounds.

Dr. Lownik, in answer to a hypothetical question embodying all the facts above set forth except the fall in the sweet pickle room, stated there was a causal connection between the work and the hernia, "because chronic hernia is a chronic disease where certain tissues gradually lose their function and become defective in their physical and physiological average normal requirements to the whole body." Dr. Albert C. Field, a witness for defendant in error, testified in answer to the same hypothetical question, that there was a direct connection between the work deceased was doing and the subsequent ill-being of hernia. Dr. Leo Zimmerman, a witness for plaintiff in error, testified the hazards leading to the development of hernia are prevalent in the lives of all individuals; that all individuals are subject to strain, coughing, sneezing, stooping, defecation and blowing their noses, and all of these constitute hazards outside the nature of the man's employment. On cross-examination, he stated that in hernia you have a predisposition and either one serious strain or a number of repeated strains, in order to produce bulging that we call hernia.

Section 6 of the Workmen's Occupational Diseases act is divided into two paragraphs. The first defines what diseases shall be considered occupational. It reads: "In this act the term 'Occupational Disease' means a disease arising out of and in the course of the employment. Ordinary dis-

eases of life to which the general public is exposed outside of the employment shall not be compensable, except where the said diseases follow as an incident of an occupational disease as defined in this section." The second paragraph lays down the test for determining when such disease shall be considered to arise out of the employment and thus satisfy one of the elements of an occupational disease as defined in the first paragraph. It is as follows:

"A disease shall be deemed to arise out of the employment, only if there is apparent to the rational mind upon consideration of all the circumstances, a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

Thus it will be seen that in order to be compensable as an occupational disease, paragraph one requires the presence of three elements: (1) The disease must arise out of the employment; (2) it must arise in the course of the employment; and (3) it must not be an ordinary disease of life to which the general public is exposed outside of the employment, unless it follows as an incident of an occupational disease. All three elements must be present, and it is of no avail to a claimant to show that the requirements of paragraph 2 have been met—that is, that the disease was caused by the employment—if either of the other elements is lacking. In other words, it is not sufficient for a claim-

ant to show a chronic hernia arose out of the employment, because of repeated strain over a period of years. He must also show that such hernia is not an ordinary disease of life to which the general public outside the employment is exposed, unless it followed as an incident of an occupational disease. It is not contended here that the hernia was an incident of an occupational disease. What we have said is consistent with our holding in *Stewart Warner Corp.* v. *Industrial Com.* 376 Ill. 141. In that case the contention was that the deceased employee's tuberculosis, of which he died, was caused by the conditions of his employment. In holding claimants were not entitled to compensation under the Workmen's Occupational Diseases act, we placed the decision on two grounds: (1) It was not proved the conditions of employment directly caused the tuberculosis and (2) tuberculosis "is a disease referred to in the statute as one of the ordinary diseases of life to which the general public is exposed outside of employment." We do not consider it worthwhile to discuss cases from other jurisdictions. Our statute contains its own definition of an occupational disease and is different from the statutes involved in any of the cited cases.

There is little left for us to decide in view of the construction we have placed on section 6. There is no doubt that hernia is an ordinary disease of life to which the general public is exposed. People in all walks of life have hernias, and the causes of them are so numerous that it cannot be said they are peculiar to any employment. Nearly everybody expends energy every day in a manner which might in time produce a weakening of the abdominal walls and result in what is described as a chronic hernia especially if such person has the predisposition to hernia. Hernia is as much an ordinary disease of life to which the general public is exposed as is tuberculosis.

The judgment is reversed and the cause remanded, with directions to set aside the award.

*Reversed and remanded, with directions.*