Chester G. LIEBRUM, Employee,
Plaintiff-Respondent,

v.

LACLEDE GAS COMPANY, Employer,
Defendant-Appellant.

No. 32708.

St. Louis Court of Appeals.

Missouri.

July 18, 1967.

Motion for Rehearing or to Transfer to Supreme Court Denied Sept. 12, 1967.

Application to Transfer Denied
Nov. 13, 1967.

**518**

Joseph H. Mueller, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant.

Mantia, Madigan & Noble, by J. Martin Hadican, St. Louis, for respondent.

CLEMENS, Commissioner.

The Industrial Commission awarded plaintiff $6,402.50 for disability arising from a heart ailment that occurred upon inhaling ammonia fumes while he was servicing air conditioners. On the defendant's appeal, the circuit court affirmed plaintiff's award. Defendant again appeals. The main issue is whether the plaintiff's disabling heart disease was the result of either an accident or an occupational disease.

The evidence came from claimant, 55-year-old Chester G. Liebrum, a 30-year employee of defendant; Dr. James W. Fletes, his physician; and Dr. Charles W. Miller, the defendant's medical examiner. We summarize their testimony, in a light consistent with the commission's award in favor of claimant.

Chester Liebrum testified: During the spring and summer of 1962 he worked on industrial heating equipment and home air-conditioners. He spent about a third of his time servicing air conditioners containing ammonia gas. This service involved the "purging" of pipes containing ammonia and the repairing of leaks, i. e., leaking ammonia fumes. Mr. Liebrum said that while working on these gas air-conditioners he would "cut them out" and a "big cloud of fumes would come out"; he would have to run away from the cloud of gas to get some air. He would then "cough and spit up the stuff" and get his breath. After a short interval he would go to work again. These exposures to the am-

monia gas fumes irritated his eyes, nose and throat and caused shortness of breath, coughing seizures and chest pains. He said the chest pains scared him because it "felt like I was having a heart attack."

On cross-examination Mr. Liebrum said he had worked on twelve gas air-conditioners during the spring and summer of 1962; that while working on a "leaker" he sometimes came in contact with ammonia fumes "maybe five or six, maybe ten times"; that he got chest pains only when working on gas units that were leaking ammonia fumes; that he first noticed the chest pains in early summer but they started to increase in September.

In the first part of December 1962 Mr. Liebrum went to the company nurse complaining of a headache, a cold and chest pains; he told her that he had been exposed to ammonia fumes the past summer. Later, on another visit, Mr. Liebrum told the nurse he still had chest pains and was going to a doctor "if they don't go away." On December 14 Mr. Liebrum went to his wife's doctor, Dr. James W. Fletes. He told the doctor about his cold and chest pains—how they would get worse when he went up and down steps—and that he thought he was going to have a heart attack.

In sum, Dr. Fletes said he believed Mr. Liebrum was one-third disabled from his work by sclerotic heart disease, aggravated by a series of exposures to ammonia fumes that brought on anginal pains and "cardiac neurosis." Dr. Fletes' first examination was at his office in December 1962, after Mr. Liebrum's cold and the series of exposures to ammonia. Mr. Liebrum was "overly anxious" and complained of chest pains on effort or emotional stress. To Dr. Fletes, Mr. Liebrum's description of these pains indicated angina pectoris: sudden pain, breathlessness and apprehension brought on by suffocation of the heart muscle due to inadequate blood supply. These pains, Mr. Liebrum told Dr. Fletes, had first come on after exposures to ammonia

fumes, and subsided after he got away from the ammonia and rested. Electrocardiogram examination showed a contraction of the arteries that nourish the heart muscle, which had been damaged by lack of adequate blood supply. Dr. Fletes sent Mr. Liebrum to the hospital for further examination and treatment.

At the hospital, X rays and another electrocardiogram showed an enlarged heart and a narrowing of the blood vessels that nourish the heart muscle. By then Mr. Liebrum was developing a cardiac neurosis. Dr. Fletes explained this, saying that the fear of dying often comes upon heart patients; it is an "emotional fear response to physical symptoms." This cardiac neurosis is aggravated by physical or emotional stress.

After Mr. Liebrum's four days in the hospital, Dr. Fletes prescribed prolonged rest, diathermy, nitroglycerine to dilate the cardiac vessels, digitalis to stimulate the heart, B-12 injections for the nervous system—and he "bombarded Mr. Liebrum with reassurance" to help relieve the cardiac neurosis. Dr. Fletes kept Mr. Liebrum off work for about a year and a half, and then let him return to do light clerical work for the defendant. Just a week before the hearing Mr. Liebrum had heard a rumor he was being transferred from clerical to physical labor, and he came to Dr. Fletes' office "in panic," flushed and complaining of heart pains. Examination showed a loss of heart beat rhythm, a normal reaction of a person with cardiac neurosis.

At the hearing, almost two years after his first examination of Mr. Liebrum, Dr. Fletes diagnosed his condition as one-third disabled, ten per cent of the disability being due to coronary sclerotic heart disease and ninety per cent due to cardiac neurosis. In response to hypothetical questions, Dr. Fletes gave his opinion that before Mr. Liebrum's first acute symptoms upon exposure to ammonia fumes he had been developing a progressive hardening or

narrowing of the coronary blood vessels that nourish the heart. Dr. Fletes said that a coronary sclerotic heart condition is gradually progressive with age. He said Mr. Liebrum had an existing coronary sclerotic heart disease but it was sub-clinical—without symptoms—before inhaling ammonia fumes, which then brought on the anginal pains. This condition was not enough to necessarily bring on Mr. Liebrum's anginal heart pains, but in his condition oxygen supply was critical and each exposure to ammonia fumes cut off this vital oxygen supply enough to cause "precardial pain or distress." It was Dr. Fletes' opinion that "the coronary heart condition was accelerated by the shock to his heart caused by the inhalation of the ammonia fumes," that this in turn was aggravated by Mr. Liebrum's emotional reaction to his physical symptoms, and that the described circumstances were "the competent producing cause of his cardiac neurosis."

As said, the defendant produced Dr. Charles W. Miller, who had examined Mr. Liebrum. He diagnosed his condition as "coronary sclerosis manifested by anginal seizures," and said that persons in this condition "regularly develop a severe state of anxiety or neurosis." Dr. Miller gave his opinion that there is no relationship between inhaling ammonia fumes and heart disease.

On this evidence the referee found as facts the exposure to ammonia fumes, the anginal condition, and the cardiac neurosis. He did not, however, find a causal connection between inhalation of the ammonia fumes and Mr. Liebrum's anginal condition. The Industrial Commission found otherwise:

"That while there was no direct causal connection between the hereinabove mentioned accidents and exposures and the pre-existing heart condition of claimant (arteriosclerosis with angina pectoris heart disease) when isolated and considered apart and exclusive of the subject neurosis, the accidents and exposures hereinabove mentioned, together with the neurosis directly caused thereby, aggravated the pre-existing heart condition of claimant contributing to the disability suffered; * * *."

The commission also found that Mr. Liebrum's "accident or occupational disease" arose out of and in the course of his employment. We deal with these alternate findings in turn.

 We must reject the commission's finding that Mr. Liebrum's acts of exposing himself to ammonia were accidents. These acts were intentional and did not meet the statutory requirement of § 287.-020, V.A.M.S., defining "accident," because they were not unexpected or unforeseen events. The commission found Mr. Liebrum's acts were "unexpected and unforeseen as to the dangerous degree, extent and result thereof." True, but that will not support a recovery for statutory accident, because it is the event—not just the result—that must be unexpected and unforeseen. Thus, where a deliberate act or series of acts causes an unexpected physical injury, as here, there is no compensable accident. See Tines v. Brown Shoe Co., Mo.App., 290 S.W.2d 200 [1–3], and the oft-cited case of State ex rel. Hussman-Ligonier Co. v. Hughes, 348 Mo. 319, 153 S.W.2d 40 [4]. From this conclusion that there was no accident, we turn to the commission's finding that Mr. Liebrum suffered an occupational disease.

In determining the validity of this finding of occupational disease, we are not confined to the former judicial interpretations of that term; instead, we look to the statutory definition enacted in 1959, now § 287.067, V.A.M.S. Prior cases (see 29A Mo.Digest, Workmen's Compensation, ⊜548) held that the necessary elements of an occupational disease were that the disease be the natural result of the employment, that it be a disease peculiar to the employment, and that there be a known relationship between the disease and the

employment. By paragraph 1 of § 287.067, V.A.M.S., enacted in 1959, the legislature defined occupational disease. We quote that statute, numbering the sentences serially and emphasizing the words that reflect the same necessary elements of an occupational disease that existed before its enactment:

"[1] In this chapter the term 'occupational disease' is hereby defined to mean a disease *arising out of* and in the course of *the employment.* [2] *Ordinary disease of life to which the general public is exposed outside of the employment shall not be compensable,* except where the said diseases follow as an incident of an occupational disease as defined in this section. [3] A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind upon consideration of all the circumstances *a direct causal connection between the conditions under which the work is performed and the occupational disease,* and which can be seen to have *followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment* and which can be *fairly traced to the employment as the proximate cause,* and *which does not come from a hazard to which workmen would have been equally exposed outside of the employment.* [4] The disease must be *incidental to the character of the business* and not independent of the relation of employer and employee. [5] The disease need not to have been foreseen or expected but after its contraction it must appear *to have had its origin in a risk connected with the employment* and to have flowed from that source as a rational consequence."

Thus, the legislature has not thrown open the door to provide compensation merely because a workman's disease is somehow affected by or arises during his employment. Essentially, the statute defining occupational disease is declaratory of the necessary elements that courts formerly prescribed by judicial interpretation.

There are two grounds on which we conclude that the commission erred in finding an occupational disease, as that term is defined by the statute. First, by inescapable inference heart disease is excluded by the statute. Second, the heart disease did not arise out of Mr. Liebrum's employment.

By its second sentence § 287.067, V.A.M.S., excludes "ordinary diseases of life to which the general public is exposed." By its fourth sentence the statute requires that "the disease must be incidental to the character of the business." It is common knowledge that sclerotic heart disease is an ordinary disease, afflicting people in all walks of life, particularly in middle and advanced age. And there was no evidence—and probably could be none—to show that sclerotic heart disease was incidental to the character of the defendant's business. Although the Workmen's Compensation Act is to be liberally interpreted, we cannot read into it a provision that all diseases which are incurred during—or worsened by—an employment are occupational diseases.

Next, we note that the first sentence of § 287.067, V.A.M.S., defines an occupational disease as one arising out of the employment. The third sentence requires that there be a direct causal connection between the working conditions and the disease. Dr. Fletes testified that Mr. Liebrum's coronary sclerotic heart disease was progressive and existed before his exposure to the ammonia fumes. The commission found a "pre-existing heart condition of claimant (arteriosclerosis with angina pectoris heart disease) * * *." So, Mr. Liebrum's heart disease arose at some unspecified prior time, and its origin was unrelated to the conditions of his employment. It follows that his disease did not arise out of his employment.

These conclusions, that Mr. Liebrum's heart ailment was an ordinary disease and that it was not causally connected with his employment, leave only one issue: the commission's finding that the exposure to ammonia fumes "aggravated the pre-existing heart condition of claimant contributing to the disability suffered." Considering our rulings that at the time of exposure to ammonia fumes Mr. Liebrum did not have an occupational disease, but only an ordinary disease, the commission's finding of aggravation poses this question: Where a workman is suffering from an ordinary disease and that disease is aggravated by non-accidental conditions of his work, is the aggravated physical condition an occupational disease? Nothing in the statute declares it so. Logic rejects the conclusion. Almost any working condition can adversely affect an ordinary illness. A workman's pre-existing tuberculosis, pneumonia or even a common cold could well be aggravated into disability by the conditions of his work. The ensuing illness would not thereby become an occupational disease. Were it otherwise, a workman could convert any ordinary progressive disease into an occupational disease merely by going to work, instead of visiting his doctor or staying home. We hold that Mr. Liebrum's pre-existing heart disease did not become an occupational disease merely by being aggravated by his working conditions.

We have considered that the claimant's cardiac neurosis followed as the natural result of the aggravation of his pre-existing heart condition. Disabling though it was, this neurosis was not an occupational disease. Both Dr. Fletes and Dr. Miller testified that persons afflicted with heart disease often suffer from neurosis, a nervous disorder manifested by anxiety. Thus, neurosis in itself is an ordinary disease to which the general public is exposed. By the last clause of the second sentence of § 287.067, V.A.M.S., such an ordinary disease is compensable only if it "follows as an incident of an occupational disease." The anginal heart disease was not an occupational disease, so neither was the incidental cardiac neurosis.

Because § 287.067, V.A.M.S., has not been previously interpreted by our own courts, we have examined opinions of the courts of Indiana and Illinois, states that have occupational disease statutes virtually identical with our own: Burns' Ind.Ann. St. § 40–2206, and Smith-Hurd's Ill.Ann.St. Ch. 48, § 172.36(d). We summarize four of those opinions, not because they are controlling here but because they relate to our own analysis of § 287.067, V.A.M.S.

In the case of Star Publishing Co. v. Jackson, 115 Ind.App. 221, 58 N.E.2d 202 (banc), the claimant was a linotype operator, and after many years of work his left hand would cramp and draw up as he worked. Medical testimony was that the tendons, nerves and arteries of the claimant's arm appeared normal but were affected by chronic fatigue. His doctor diagnosed the claimant's condition as a neurosis resulting from this chronic fatigue. In denying recovery the court said this evidence showed that the chronic fatigue resulted from the claimant's work, and that the neurosis resulted from the fatigue. The court held that the neurosis was a non-occupational disease and would be compensable only if it resulted from a preceding occupational disease. Relying on the second sentence of the occupational disease statute ("Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, * * *"), the court ruled that the initial fatigue "is in its very nature common to nearly all employments and to countless other of the ordinary activities of life. * * * We therefore hold that chronic fatigue, if a disease at all, was not in this case shown to be an occupational disease as defined by law."

By contrast, in Chevrolet Muncie Division of General Motors Corporation v. Hirst, 113 Ind.App. 181, 46 N.E.2d 281

(banc), recovery was granted for an occupational disease because the disease was caused initially by peculiar working conditions. In November 1936 claimant was a healthy man. He then began work in a department where he was exposed to chemical fumes. In early 1937 he began coughing violently and by December of 1937 he became disabled. (Another workman was affected in a like manner but to a lesser extent). These symptoms were caused by inflammation of the lungs and bronchial tubes, brought on by inhaling the chemical fumes. This physical debility then brought on bronchiectasis, an ordinary disease of life to which the general public is exposed. In affirming claimant's award the court held (1) that the inflammation of the claimant's lungs and bronchial tubes was an occupational disease arising out of his employment, and (2) that the bronchiectasis followed as an incident of the occupational disease.

In the case of Kniat v. Industrial Commission, 378 Ill. 210, 37 N.E.2d 810, the workman had first developed a chronic hernia because of heavy lifting over many years; he then had a fall which injured his side and produced an acute hernia; he died as a result of pneumonia following hernial surgery. In denying the claim the court construed the occupational disease statute, saying it is not sufficient for a claimant to show that the chronic hernia arose out of the employment, and adding: "He must also show that such hernia is not an ordinary disease of life to which the general public outside the employment is exposed, * * *." The court further said: "There is no doubt that hernia is an ordinary disease of life to which the general public is exposed. People in all walks of life have hernias, and the causes of them are so numerous that it cannot be said they are peculiar to any employment."

Even more like our case is that of Stewart Warner Corp. v. Industrial Commission, 376 Ill. 141, 33 N.E.2d 196. There the employee tested refrigerators, going back and forth many times a day from a cold room to a hot room. In the cold room he was exposed to sulphur dioxide, which caused violent sneezing and coughing. Before this the employee was strong and well. About four months after he quit work he was found to have pulmonary tuberculosis. His doctors testified that claimant "had an old tuberculosis" which had not interfered with his work, but that the intermittent chillings of his body caused him to lose weight and reduced his resistance to germs; that an acute respiratory infection developed which activated the old tubercular process, and that "the working conditions thereby had a direct influence on his death." The court applied its statutory definition of occupational disease, and in denying compensation said: "There are persons of all ages and in all walks of life who have tubercular bacilli in their bodies. There is no proof that the germ infection was a hazard of the work in which deceased was engaged. Proof that the hazards of the employment produced a weakened physical condition and a lowered resistance to germs does not establish that such a hazard was the direct cause of the tuberculosis. It is well known that there are many things that weaken the physical condition and lessen the resistance to germs which are not in any way related to an employment. Even though the temperature changed and the sulphur dioxide gas caused the change in the deceased's physical condition, it does not follow from such proof that tuberculosis had its origin in the hazards of the employment and that it came from such hazard as a rational consequence as is required by the statute. It is a disease referred to in the statute as one of the ordinary diseases of life to which the general public is exposed outside of employment." In that case the claimant's strongest medical testimony was that "sulphur dioxide itself would not cause the tuberculosis but it would cause an activation; * * * there would be a gradual infection of the respiratory tract, causing an irritating condition which would help

the germs in the lung tissue to become active." The court said: "Such evidence merely shows conditions which will activate tubercle bacilli and cause tuberculosis. It does not show that he was poisoned or that he had an occupational disease."

In summary, we hold that the commission erred in each of its alternate findings of accident and occupational disease. The claimant was not disabled by an accident, because his disability arose from his deliberate acts. Nor was the claimant disabled by an occupational disease, because his disease had a natural rather than an occupational origin.

The judgment affirming the award should be reversed, and the cause remanded with instructions to enter a new judgment reversing the award of the Industrial Commission.

PER CURIAM:

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, the judgment affirming the award is reversed, and the cause is remanded with instructions to enter a new judgment reversing the award of the Industrial Commission.

ANDERSON, P. J., WOLFE, J., and SAMUEL E. SEMPLE, Special Judge, concur.