(No. 42869.—

ALFRED WOOD, Appellee, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(NATIONAL CASTINGS COMPANY, Appellant.)

*Opinion filed Dec. 4, 1970.—Rehearing denied Jan. 27, 1971.*

ROBERT H. JOYCE and ANDREW M. KRAMER, both of SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, of Chicago, for appellant.

LOUIS J. COHN, BENJAMIN F. COHN, and STANFORD L. LAMBERT, all of COHN, COHN & LAMBERT, of Chicago, for appellee.

Mr. JUSTICE BURT delivered the opinion of the court:

Alfred Wood, the petitioner-appellee, filed an application for adjustment of claim with the Industrial Commission under the provisions of section 19 of the Workmen's Occupational Diseases Act (Ill. Rev. Stat. 1965, ch. 48, par. 172.54), against National Castings Company, on April

18, 1966, claiming that he had contracted an occupational disease while working for the company. The arbitrator held that on July 7, 1965, petitioner was disabled by an occupational disease resulting from exposure during employment by the respondent company and made an award based upon permanent and total disability.

The Industrial Commission reversed the arbitrator on the ground petitioner had failed in the burden of proof to establish that he had contracted an occupational disease as defined in the Act. The circuit court thereupon reversed the Commission and reinstated the award of the arbitrator.

It is the position of the respondent company that petitioner was not suffering from an occupational disease and that the decision of the circuit court was contrary to the manifest weight of the evidence and, as a matter of law, erroneous.

Alfred Wood was employed by National Castings Company in 1948 at the age of 35 and continued his employment with this company thereafter until July 7, 1965. At the time of his employment he weighed 170 pounds and at the time of the hearing before the arbitrator on November 2, 1967 his weight was down to 145 pounds. He never smoked and has never worked on a similar job for any other company. At the time of his employment he was feeling well and he had no history of any abnormal chest or lung conditions for which he had treatment. At the time of his employment he was given an examination, with X rays, by the company.

During the 17 years he worked for the company he had only one job, working as a swing grinder on castings on the same machine and in the same department. On his job the petitioner operated in a tin shanty 13' x 14' with three sides and a roof, in a large foundry building. He never wore a mask. There was a ventilator in the ceiling. Steel and sand would gather on the floor from the grinding of castings and upon "shake-out" it would be dusty and at times one could not see, according to petitioner. He further stated that a

sand and emery product would result from grinding and fall on the floor. A lot of dust would be shovelled, which would be fine steel and sand and would be placed into buckets or boxes weighing 500 pounds. There would be an average of three boxes filled twice a week.

Petitioner described the preparation of molds, where sand is used, located from 35 to 80 feet away, and the pouring of the molten metal was about 35 to 40 feet away. The castings came on a conveyor to him while cooling and hardening. Then the castings get a "shake-out" on a large bed or grating that actually shakes, and from there the castings go to the "burn-off" men, and then the rough grinding is done by petitioner. The burn-off operation is 150-160 feet from petitioner's position.

Dust collectors and ventilators were located where the shake-out operations were performed. The collectors and ventilators, however, were not always working. About two or three times a week the dust collectors might not work, even though these machines sometimes would operate continuously for several weeks.

Petitioner worked five or six days a week and on some weeks seven days with an average of eight hours a day.

Petitioner testified that his illness became serious enough to require attention about July of 1965, when he began to run a fever and found himself becoming short of breath and he was losing weight. He saw the company doctors, who told him to see his own doctor, so he went to the University of Chicago Clinic. He was sent to Billings Hospital where examinations and tests were made. He was in the hospital from July 15 to August 3 or 4, 1965. During this time he felt weak and sick, had a cough, which "raised something up", fever, and shortness of breath. Since July of 1965 petitioner stated he has been unable to work except to do chores around the house. Walking was limited to half a block.

In support of his claim petitioner called Dr. William

Colburn, a consulting chemist since 1939, with a Ph.D. from the University of Chicago, and head of the Colburn Laboratories with eight chemists under his direction. He had been furnished samples of the materials with which petitioner worked, which, he said, had the appearance of iron filings. Analysis of the sample showed 1.38 per cent of the weight of the sample originally submitted to be both free and combined silica. He estimated about $\frac{1}{3}$ of the silica was free silica particles ranging in size from 1 to 10 microns capable of being airborne and inhaled.

Petitioner's medical testimony was furnished by Dr. Johann Bornstein, an attending physician at Michael Reese Hospital in the department of thoracic medicine, and a consultant for 15 years at the Winfield Sanitarium. He stated he had examined probably a half million X rays. His specialities were internal and thoracic medicine. He testified that he examined petitioner in December, 1966, and February, 1967, and found him "wheezy and his electrocardiogram was abnormal, and in addition he had a clubbing of the fingernails", due to lack of oxygen. The X rays showed numerous small nodules, some calcified and some uncalcified in and about the hilar area of the lungs, measuring about four millimeters, he testified, which indicated pulmonary disease. He answered a hypothetical question by saying that in his opinion there was a definite relationship between this man's occupational exposure to silica and the findings previously mentioned and his total disability. He said, "The diagnoses of Mr. Wood are multiple. His X-ray findings which go along with his history do not go along with the routine cases of emphysema. He also has some cardiovascular abnormalities, and that was disclosed by my physical examination and partially by the X rays. Three, he may very well have a fungus infection which is not active, such as histoplasmosis, which is a positive skin test for tuberculosis. * * * It is a fungus infection which is found in the soil. * * * It can look like tuberculosis."

He ruled out tuberculosis and fungi as a cause. When cross-examined by respondent's attorney he stated that the noncalcified modules on the lungs shown on the X rays were caused by his occupational exposure and were one symptom which would not be present in a person not subject to such exposure. He admitted that many of the other symptoms possibly could occur without such exposure. He further testified on redirect examination: "I do not call this a pure case of silicosis. In my opinion, I think that this man has pneumosilicosis or pneumoconiosis-silicosis. What do I mean by that? It means that he is breathing in inert particles as well as active particles." Pneumosilicosis is defined as the deposition of silica bearing particles of foreign matter in the lungs. Pneumoconiosis is a disease due to inhalation of iron ore dust containing silica.

He testified that the patient's condition was permanent although he could be helped subjectively, and with medication.

Doctor Bornstein also testified on cross-examination, "I think that fundamentally this man became disabled because of his occupation and these other complications which did occur. For example, emphysema is a complication." When asked if this were not an ordinary disease of life, he replied, "It is a very complicated disease. If you say it is common, yes, but I do not use the word ordinary, because that is very conflicting." Then, in response to the question, "Is emphysema part of the complicating factors?" He replied, "It necessarily is because you start with process A and reach a certain point of disability and then everything else happens."

The respondent put in no testimony except that of Dr. Harold K. Steinberg, who had post-graduate training in lung and occupational diseases at the University of Minnesota and Harvard University. On direct examination he first defined silicosis as "a disease of the lungs caused by the breathing of air in a certain concentration over a long

period of time, the breathing in of air containing silicon dioxide, free silica. And this dust produces a routine response on the part of the protective system in the lung tissue which produces an encapsulation of the dust particles; and, the reaction to the free quality of the dust particles produces a fibrous reaction and this in turn if over a long enough period of time will produce an accumulation of fibrous tissue and show up in a rather typical pattern, nodular pattern which presents itself as in the presence of varicosities. The disease early in its existence or when tuberculosis was very prominent was very often conflicted with tuberculosis which resulted in pulmonary disability. Most recently it has been conflicted by a disease known as emphysema, which again produced in far advanced cases pulmonary disability. * * * Silicosis is diagnosed by occupational history and then by clinical examination and most completely in addition thereto by an X-ray examination of the chest."

He examined petitioner once at his office on May 9, 1967, with X rays taken, and he checked the hospital records. The petitioner's attorney complained about the darkness of the X rays. Dr. Steinberg could see no uncalcified nodules, as reported by Dr. Bornstein.

The law applicable in cases of this kind is quite clear. It is the duty of the petitioner to carry the burden of showing that he has a disabling disease and that there is a direct causal connection between the disease and his employment. *Rockford Transit Corp.* v. *Industrial Com.,* 38 Ill.2d 111; *Kniat* v. *Industrial Com.,* 378 Ill. 210; Ill. Rev. Stat., 1965, ch. 48, par. 172.36 *et seq.*

There is no question that the petitioner is disabled, as found by the arbitrator, in spite of the opinion of Dr. Steinberg that he could do some work. Petitioner's testimony describing his weakened condition in 1965 and ever since, coupled with the evidence furnished by Dr. Bornstein, is strong enough to support the finding of the arbitrator that the disability was total and permanent.

Respondent argues, however, that the petitioner's illness was in no way related to his occupation, but was merely the result of the onset of an ordinary disease of life, as Dr. Steinberg stated, and as the Industrial Commission found.

It is true that this court has held in numerous opinions that unless the decision of the Industrial Commission is contrary to the manifest weight of the evidence it must be sustained. *Rockford Transit Corp.* v. *Industrial Com.*, 38 Ill.2d 111; *Lewis* v. *Industrial Com.*, 38 Ill.2d 461; *Overland Construction Co.* v. *Industrial Com.*, 37 Ill.2d 525.

Dr. Bornstein's testimony was that the petitioner's disablement was related to his employment, based upon the history of 17 years of exposure, working with a grinder on castings of steel, to which sand containing silica would be clinging, without a mask, in a small shanty with defective exhaust equipment, and near the shaking operation with silica and iron particles both airborne and lying around the floor; the objective findings of the size of the particles; and the findings of the noncalcified nodules in the lungs. He ruled out any active tuberculosis and fungus and indicated that the disease was caused by foreign particles to which the public is not exposed in ordinary life.

The testimony of Dr. Steinberg does not directly conflict with that of Dr. Bornstein in many respects. Dr. Steinberg did not see the noncalcified nodules in the X rays he had taken (possibly because they were unusually dark, as the record indicated), and his opinion as to the cause of disability differs in that he attributes the entire disability to an old abcess in the lungs, following pneumonia.

In our opinion, the decision of the Industrial Commission is clearly contrary to the manifest weight of the evidence. For this reason we sustain the decision of the circuit court of Cook County, reversing the Industrial Commission and restoring the award of the arbitrator in favor of petitioner.

*Judgment affirmed.*