Kathryn **COLLINS**, Respondent,

v.

**NEEVEL LUGGAGE MANUFACTURING COMPANY, and the Travelers Insurance Company, Appellants.**

**No. 25632.**

Missouri Court of Appeals,
Kansas City District.

April 3, 1972.
Motion for Rehearing and/or Transfer to Supreme Court Denied May 11, 1972.
Application to Transfer Denied July 17, 1972.

Gary E. Lowe and Jack B. Robertson Rogers, Field, Gentry, Benjamin & Robertson, J. Richard Hachey, Kansas City, for appellants.

Herman M. Swafford, A. J. Falcone, Kansas City, for respondent.

Richard B. McKelvey, Paul Scott Kelly, Jr., Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, Earnest L. Keathley, Jr., St. Louis, for amicus curiae, Associated Industries of Missouri.

SHANGLER, Chief Judge.

The Industrial Commission, by a split vote, determined that the bilateral carpal syndrome exhibited by Kathryn Collins, an employee engaged in the manufacture of luggage, was an occupational disease under Sections 287.063 and 287.067, V.A.M.S., and awarded her compensation. The employer and insurer have appealed from the judgment of the Circuit Court affirming the award, which they say is not supported by competent and substantial evidence on the whole record.

Kathryn Collins was fifty years of age and, except for a brief interval, had worked for appellant Neevel Manufacturing Company for seventeen years. Her usual work was placing hinges on suitcases, but on July 1, 1967, she was given the task of putting valances on pieces of luggage as they came along on an assembly line. A valance is a metal rim, aluminum in this instance, which fits over the frame of a piece of luggage where the two sides close together. Each metal rim was inserted manually around the wooden frame of the luggage. This procedure required Mrs. Collins to bend her fingers toward the palms of her hands, exert pressure downward and inward to force the rim onto the luggage frame. In the course of an hour, she would complete 100 to 200 pieces of luggage, depending on the size, and would flex her wrists about once a second in the process. This task was performed for one hour a day during the week and for six to eight hours on Saturday. The other working hours were spent doing other tasks.

After approximately two weeks of this regimen, Mrs. Collins began to wake up during the night and find her hands asleep. She soon developed pain "at the big part of the thumb(s)", between the joints of the index fingers and in the thenar surface of the thumbs. Pain then developed in her forearms and eventually in the upper part of both arms. The pain symptoms were more severe in her left hand than in her right. On July 24, 1967, Mrs. Collins went to the University of Kansas Medical Center and thereafter submitted to tests, whirlpool treatments and injections. She was referred to Dr. William P. Williamson, Chief of Staff of neurosurgery, who operated on her left hand and wrist. The hospital records, given in evidence, show the diagnosis as carpal tunnel syndrome and the surgical procedure as a revision of the transverse carpal ligament.

Also in evidence were the medical reports of Dr. Revis C. Lewis, neurosurgeon, and Dr. Edwin B. Shires, neurologist, each of whom was appointed a neutral examiner by the Referee. Both examiners found Mrs. Collins exhibited a bilateral carpal tunnel syndrome, but neither expressed an opinion as to cause.

Dr. Bernard Abrams, a neurologist, was called by the employee to give expert testimony on carpal tunnel syndrome and its

relationship to occupational activity. He described the carpal tunnel syndrome as a disease characterized by a train of symptoms produced by the entrapment of the median nerve in the carpal tunnel, which is on the outside of the wrist. The resultant nerve compression gives rise to characteristic complaints. The first of these complaints, usually experienced nocturnally while abed, is a "draginess" of the affected hand followed by a sensory numbness in the fingers and hand along the distribution pattern of the median nerve, onset of pain in the hand, weakness in grasping and loss of the sensory and motor functions of parts of the thumb and fingers. These symptoms may be relieved by incising the carpal ligament and reattaching it loosely, thereby easing the compression of the median nerve.

Dr. Abrams testified that in his five years of practice he has seen 30 or 40 cases of carpal tunnel syndrome. It was his expert opinion that sixty per cent of the time the cause of this disease is "pure unadulterated constant trauma" over some period of time. It was also his testimony that repetitive flexion of the wrist and hand under pressure was a form of trauma sufficient either to cause or contribute to the development of carpal tunnel syndrome. In addition, he was of opinion that a change in occupation may precipitate the syndrome by changing the relationship of the nerve to the structure surrounding it which has been conditioned by use. Perhaps because of their lighter bone structure, the incidence of the disease is three women to every two men. The syndrome is developmental and can fully mature within a two week period. Although repetitive flexion of the wrists and hands under pressure is "far away the largest cause of carpal tunnel syndrome", Dr. Abrams testified it may also be caused by cancer in the carpal tunnel, abnormal tissue growth in the tunnel, overgrowth in the fibrous canals or sheaths, multiple myeloma, myxedema or hyperthyroidism, pregnancy if the tissues are engorged with fluid, and diseases affecting the tissues.

Dr. Irving A. Wien, a general surgeon with a practice in industrial medicine also testified for the employee. He first examined Mrs. Collins on June 28, 1968, after surgery had been done to her left hand and wrist. The employee's symptoms were described as a classic carpal tunnel syndrome, a disease he considered relatively uncommon. He gave as a common cause of the disease chronic trauma resulting from continuous, repetitive use of wrists and hands. In answer to a hypothetical question positing the relevant evidentiary facts, Dr. Wien gave his opinion with reasonable medical certainty that the recurrent flexion and manipulation required for the insertion of the metal valances during the two week period caused the employee's carpal tunnel syndrome. He also made the distinction between ordinary wrist movement, which does not involve a motion identically repeated and occupational wrist movement, which does.

Dr. Wien examined the University of Kansas Medical Center record, which had been received in evidence, and found that the laboratory reports on the employee's blood and urine were normal; no diabetes was found; x-rays of the carpal bones showed normal placement; there was no arthritis, or finding of tumor or ganglion; there was no inflammation of the fibrous tissues, nor cancer nor benign tumor; and there was no evidence of any systemic or infectious disease. It was his conclusion that the carpal tunnel syndrome exhibited by Mrs. Collins was the result of a thickening of the transverse carpal ligament brought on by the occupational trauma of repetitive wrist flexions.

Whether, on this evidence, the decision of the majority of the Industrial Commission awarding the employee compensation may be sustained is to be determined by reference to Section 287.067, V.A.M.S., which defines occupational disease. Prior to the enactment of that section in 1959, in the absence of statutory definition, recovery for occupational disease both by actions at common law and claims under the 1931

amendment to the compensation law, was governed by judicial definition of that term. Downey v. Kansas City Gas Co., 338 Mo. 803, 92 S.W.2d 580, 584 [4]; Evans v. Chevrolet Motor Co., 232 Mo.App. 927, 105 S.W.2d 1081, 1084 [2]. Occupational disease, taken in its ordinary and customary sense, was judicially regarded to mean: " '(A) disease which is the natural incident or result of a particular employment and is peculiar to it, usually developing gradually from the effects of long continued work at the employment, and serving, because of its known relation to the employment, to attach to the employment a risk or hazard which distinguishes it from the ordinary run of occupations and is in excess of that attending employments in general' ". Marie v. Standard Steel Works, Mo. banc, 319 S.W.2d 871, 875 [5]. In comparison, the statutory definition of occupational disease, found in Section 287.067 [1] V.A.M.S. provides:

"In this chapter the term 'occupational disease' is hereby defined to mean a disease arising out of and in the course of the employment. *Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable,* except where the said diseases follow as an incident of an occupational disease as defined in this section. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind upon consideration of all the circumstances a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not to have been foreseen or ex-

pected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence." (Emphasis supplied.)

This statutory definition is basically a reiteration of the judicially declared standard. The statute, however, introduces language (if not a concept) not found in the decisions by denying compensation for "(o)rdinary diseases of life to which the general public is exposed outside the employment", which language appears to derive from Illinois and Indiana statutory precursors. It is the position of appellants that carpal tunnel syndrome is not an occupational disease, but is an ordinary disease of life within the meaning of the Missouri statute, and therefore not compensable.

The authority upon which appellants principally rely is Liebrum v. Laclede Gas Company, Mo.App., 419 S.W.2d 517. In that case, the employee sought compensation for occupational disease claiming that his heart had become sclerotic by the inhalation of ammonia fumes while servicing air conditioners and that a cardiac neurosis then developed incidental to the heart disease. The employee's medical evidence tended to show that the anginal pains had been brought on when the employee inhaled the ammonia fumes. It was also his evidence that even before these symptoms appeared, due to his aging, the employee had been developing a progressive hardening of the blood vessels that nourish the heart. In awarding compensation for occupational disease, the Industrial Commission found that the employee suffered an occupational disease (as well as accident) arising out of and in the course of his employment, which aggravated the preexisting heart condition and, in turn, gave rise to the neurosis. The court rejected the finding of occupational disease in this language, l.c. 521 [4, 5]:

"By its second sentence § 287.067, V.A. M.S. excludes 'ordinary diseases of life to which the general public is exposed.' By its fourth sentence the statute re-

quires that *'the disease must be incidental to the character of the business.'* It is also common knowledge that sclerotic heart disease is an ordinary disease, afflicting people in all walks of life, particularly in middle and advanced age. *And there was no evidence*—and probably could be none—*to show that sclerotic heart disease was incidental to the character of the defendant's business."* (Emphasis supplied.)

Appellants seize on this language to support their argument that since both the medical evidence and the finding of the majority of the Commission recognize that carpal tunnel syndrome is a disease of multifarious origin, both traumatic and non-traumatic, and "could have come from her occupation . . . (as well as) from many other sources well outside any occupation", carpal tunnel syndrome was an ordinary disease of life within the statute and Liebrum construing it, and therefore was not compensable. While some of the broad language in *Liebrum* is susceptible of such a reading, we understand its central holding to be the language we have stressed, that is, that compensation was denied, not because sclerotic heart disease may afflict anyone in any walk of life, but because the statutory requirement that "the disease must be incidental to the character of the (employer's) business" was not proved.

The evidentiary basis of appellants' argument is found in part of the employee's medical testimony that carpal tunnel syndrome is seen in middle aged women who have never worked at all but whose normal household duties involve flexion and extension of the wrists, such household tasks as the employee herself had performed for some 36 years. This argument is a replica of a reason given by Chairman Butler for his dissent from the majority of the Industrial Commission: "The work claimant was doing when she allegedly suffered the condition of which she complains required muscle use and physical motion, common to thousands of other jobs both in and out of industry as well as muscle use and physical movement common to hundreds of recreational activities". To accept the implications of this view is to nullify the efficacy of the Act and its legislative purpose "to render more certain the employee's compensation" for occupational disease (Marie v. Standard Steel Works, Mo. banc, 319 S. W.2d l.c. 875 [2]), for there is scarcely any movement of the human body done in the performance of an occupation which is not duplicated in everyday life, nor any compensable disease not also at some time contracted by the general public.

We think it implicit in the decisions on occupational disease as judicially defined and explicit in the provisions of Section 287.067, V.A.M.S. (which *Liebrum* acknowledges essentially declares the judicial definition, 419 S.W.2d l.c. 521 [1]), that what is distinctively occupational in a particular employment is the peculiar risk or hazard which inheres in the work conditions, and a disease which follows as a natural result of exposure to such occupational risk, an exposure which is greater or different than affects the public generally, is an occupational disease, not an ordinary disease of life.

Thus, prior to the enactment of the statutory definition, the Supreme Court en banc in Marie v. Standard Steel Works, 319 S.W.2d 871, affirmed an award to a welder for occupational disease for deafness brought on by an unusually noisy working environment, although it is apparent to us that deafness is a disease which afflicts the public generally from non-occupational causes. Implicit in that holding is the recognition that the disease resulted from the unusual exposure to incessant, magnified, noises brought on by pounding on bulkheads in which the employee was working, an exposure greater and different than that of the public. See, also: Bolosino v. Laclede Christy Clay Products Co., Mo. App., 124 S.W.2d 581, 583 [1–6]; Evans v. Chevrolet Motor Co., 232 Mo.App. 927, 105 S.W.2d 1081, 1084 [5]; Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W.2d 323, 330 [2]. Then, in Marcus v. Steel Constructors, Inc., Mo., 434 S.W.2d

475 brought under Section 287.067, V.A. M.S., claim was made for death of the employee for occupational disease said to have resulted from repeated exposures to benzol fumes in his work as a welder. The Supreme Court found that it was not shown that the employee had been exposed to benzol fumes and remanded the cause for such proof, if available, even though the medical evidence was that (1.c. 479 [1]) there are "many hundreds of known toxic substances and chemicals which could cause this condition, including some household pesticides, insecticides and some drugs". Thus, the Supreme Court construed the statute to authorize compensation for a disease for which there were "many hundreds" of known non-occupational causes, provided it be otherwise shown that the disease was actually a result of the exposure occasioned by the nature of the employment.

The latest decision of the Illinois Supreme Court which construes the occupational disease statute of that state (the identically worded prototype for our own) is Allis-Chalmers Manufacturing Company v. Industrial Commission, 33 Ill.2d 268, 211 N.E.2d 276. The question confronting the court was whether dermatitis is an occupational disease. The medical evidence was that dermatitis in its various forms is an ordinary disease of life, not peculiar to any particular employment. The employer contended that since it is a disease to which the public generally is exposed, dermatitis cannot be an occupational disease. In rejecting the employer's contention, the court read a legislative purpose we also find in our own statute (1.c. 278 [2, 3]:

"The first paragraph (of the Illinois Occupational Disease Act) does not place all ordinary diseases of life in a noncompensable status, but only those to which 'the general public is exposed outside of the employment.' The next paragraph, in turn, speaks of a disease which follows 'as a result of the exposure occasioned by the nature of the employment.' In each instance 'exposure' is a predomi-

nant factor. We believe it was the legislative intent that where an employee contracts a disease, due to exposure to hazards of a peculiar or unusual condition of work in a greater degree and in a different manner than the public generally, he is to be deemed as suffering from a compensable occupational disease."

In so doing, the court distinguished its prior holdings in Kniat v. Industrial Commission, 378 Ill. 210, 37 N.E.2d 810 and Stewart Warner Corp. v. Industrial Commission, 376 Ill. 141, 33 N.E.2d 196 (relied on by appellants and cited in *Liebrum*) wherein compensation was denied not because the diseases were inherently ordinary diseases of life, but because there was a failure of proof that they were occupational diseases. (See, also, Lewis v. Industrial Commission, 38 Ill.2d 461, 231 N.E.2d 593, 596 [3], where the holding in Allis-Chalmers was reaffirmed.)

The Appellate Court of Indiana, in Banc, in Schwitzer-Cummins Co. v. Hacker, 123 Ind.App. 674, 112 N.E.2d 221, construed its Occupational Disease Act, a statute identically worded to both our own and that of Illinois. Claim was made for bronchiectasis incidental to inflammation of the lungs caused by inhalation of contaminated industrial dust generated by milling machines operated by the employee and other workmen. There was medical evidence that bronchiectasis is a disease the general public can develop under non-occupational conditions. The employer contended that bronchiectasis is not an occupational disease because it is general to the public and one to which the public is exposed outside of any employment. The Indiana Appellate Court held, much as did the Illinois Supreme Court, that the question is not whether the workman has a disease which is common to others of the general public, but whether the particular conditions of his work caused him to succumb to the disease (1.c. 228 [4]):

"(T)he disease itself may be 'ordinary' in the sense that it is an ailment to which

many people are exposed to and suffer from, but the conditions of employment of the workman may involve a *special* or *inherent* risk or hazard of disease to which he is exposed but to which the public is not exposed. * * * Where it appears that the causative danger is inherent in or peculiar to the work performed under the then prevailing conditions which are not common to the general public outside the employment, the disease *arises* from the employment if it is causally connected therewith."

The court found nothing in its former decisions, including Chevrolet Muncie Division of General Motors Corporation v. Hirst, 113 Ind.App. 181, 46 N.E.2d 281 and Star Publishing Co. v. Jackson, 115 Ind. App. 221, 58 N.E.2d 202 (the other two authorities cited and relied on in *Liebrum*) which prevents compensation for an ordinary disease when the conditions of employment causing the disease involve a special risk to which the public generally is not exposed.

■ The majority of the Industrial Commission found that Kathryn Collins' condition of bilateral carpal syndrome was "due to occupational activity in flexing the wrists each second in placing the valances on the luggage", that there was "a direct causal connection between the conditions under which she worked and the disease" which "followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment" and which disease did not come from a hazard to which the employee would have been equally exposed outside the employment. On the evidence the Commission could reasonably have made each of these findings, and the ultimate finding that Kathryn Collins suffered a disease arising out of and in the course of the employment is therefore supported by competent and substantial evidence.

■ Appellants *do not seriously contend* that medical causation was not proved, that is, that the disease was caused by the occu-pational activity, but they unremittingly assert that legal causation was not established, that is, that the disease was not shown to be a result of a hazard peculiar to the nature of the employment, one to which the general public is not exposed. The evidence clearly demonstrates, and the Commission could have found as it did, that although many non-occupational causes for carpal tunnel syndrome are known, its producing cause in this case was the chronic trauma of the repetitive flexion of the wrists in the occupational task which wrought a thickening of the transverse carpal ligament thus overloading the carpal tunnel, compressing the median nerve, and producing the symptoms. The Commission could also have found, as it did, that the manipulations and flexions, iterated and re-iterated within a concentrated time, were unusual conditions which inhered in the employment task and exposed Kathryn Collins to a risk of that disease not shared by the public generally and to which she would not have been exposed outside of the employment. For the distinction here is that, whereas people use their hands and wrists frequently every day in and out of occupations, their exposure to carpel tunnel syndrome is casual compared to the massive exposure to which a workman is subjected who is required to perform an occupational duty involving identical hand and wrist movements every second for an hour and more than 80,000 times during a two week span. Contrary to the view appellants' argument suggests, whether a disease is occupational is not to be determined by whether the disease is literally peculiar to an occupation, but whether there is "a recognizable link between the disease and some distinctive feature of the claimant's job *which is common to all jobs of that sort*". Myers v. Rival Manufacturing Company, Mo.App., 442 S.W.2d 138, 141 [3]; National Stores, Inc. v. Hester, (Ky. App.) 393 S.W.2d 603, 605 [1, 2].

Our Workmen's Compensation Law defines occupational disease generally; no disease which arises out of and in the course of employment is excluded from its

coverage.[1] Disease resulting from the chronic traumata of repetitive occupational body movement has been held to come within such coverage by courts construing comparable statutes, and reasonably so. See, National Stores, Inc. v. Hester, (Ky. App.) 393 S.W.2d 603; Bondar v. Simmons Co., 23 N.J.Super. 109, 92 A.2d 642; Underwood v. National Motor Castings Division, 329 Mich. 273, 45 N.W.2d 286; 1A Larson, Workmen's Compensation Law, Sec. 41.50.

The judgment of the circuit court is affirmed.

All concur.

PRITCHARD, SWOFFORD, and WASSERSTROM, JJ., not participating because not members of court when cause was heard.

---

1. Section 287.020(3), V.A.M.S., distinguishes between occupational disease and contagious or infectious disease. See, Evans v. Chevrolet Motor Co., 232 Mo. App. 927, 105 S.W.2d 1081, 1083 [2]. A contagious or infectious disease is not compensable as an occupational disease unless it follows as an incident of an occupational disease. Bolosino v. Laclede Christy Clay Products Co., Mo. App., 124 S.W.2d 581, 583 [1–6]; Bess v. Coca-Cola Bottling Company of St. Louis, Mo.App., 469 S.W.2d 41, 45 [3].